FILED: 12/6/2021 4:52 PM
Vermont Superior Court
Washington Unit
21-CV-03888

USDC - DVT
2:22-cv-29

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| WASHINGTON UNIT | Docket No.: |

OLYNTHEA JOHNSON,                          *
as Administrator of the Estate of          *
KENNETH JOHNSON,                           *
        Plaintiff,                        *
                                *
        v.                                *
                                *
STATE OF VERMONT,                          *
DEPARTMENT OF CORRECTIONS;                 *
ROBERT WRIGHT;                             *
SIRENA ZAHN;                               *
BRIAN MERCER;                              *
CENTURION OF VERMONT, LLC.;                *
STEVEN FISHER, M.D.;                       *
DANIEL HOLLOWAY, M.D.;                     *
MARY MARTIN;                               *
MICHELE CARDINAL;                          *
SABINE WATSON; and                         *
UNKNOWN NURSES,                            *
               Defendants.                 *

## COMPLAINT

NOW COMES Plaintiff, Olynthea Johnson, as Administrator of the Estate of Kenneth

Johnson (hereinafter "Johnson"), by and through her attorneys, Costello, Valente & Gentry, P.C.,

and complains against Defendants in this following manner:

## BACKGROUND

1.      Scholars have been able to identify more than 4,400 documented events between

1877 and 1950 where Black Americans were killed by lynching as a form of vigilante justice.[1]

While torture, mutilation, decapitation, desecration, and immolation were sometimes the

---

[1]     *See* Equal Justice Initiative, *Reconstruction in America: Racial Violence after the Civil War, 1865-1876*
(2020) available at: https://eji.org/wp-content/uploads/2005/11/reconstruction-in-america-rev-111521.pdf.

mechanism of death, the most well-publicized method of killing was asphyxiation by hanging, often in front of a large crowd and followed by wider publication through souvenir postcards.[2]

2.      Even though lynching is now uncommon, racial disparities in the justice system remain.  Black men are six times more likely to be incarcerated than white men.[3]  Black people convicted of comparable crimes in similar circumstances receive jail sentences that are 10% longer than their white counterparts.[4]  Since 1976, 21 white assailants have been executed for killing a Black victim but over the same period, 295 Black defendants have been executed for killing a white victim.[5]

3.      Studies have shown that populations of black inmates are disciplined by prison guards at nearly twice the rate of white inmates.[6]  Black prisoners are four times as likely to be sent to isolation, and their average stay there is approximately 35 days longer.[7]  The disparities as to isolation ("solitary confinement") are greatest for infractions that place significant discretion in the hands of the correctional officer, like disobeying an order.[8]

4.      Prison systems do not allocate sufficient financial resources to properly treat the medical conditions of prisoners, and correctional policies and practices often disrupt the provision of medical care.[9]

---

[2]      *See* NAACP, *History of Lynching in America*, available at: https://naacp.org/find-resources/history-explained/history-lynching-america.

[3]      *See* The Sentencing Project, *Criminal Justice Facts* (accessed August 10, 2021), available at: https://www.sentencingproject.org/criminal-justice-facts/.

[4]      *See* Rehavi, M. and Starr, S., *Racial Disparity in Federal Criminal Sentences*, J. Pol. Econ. 122 no. 6 (2014), at 1320.

[5]      *See* NAACP-LDF, "Death Row USA" (April 1, 2021), available at: https://www.naacpldf.org/wp-content/uploads/DRUSASpring2021.pdf.

[6]      *See* Schwirtz, Michael et. al., "The Scourge of Racial Bias in New York State's Prisons," *New York Times* (December 3, 2016), available at: https://www.nytimes.com/2016/12/03/nyregion/new-york-state-prisons-inmates-racial-bias.html

[7]      *Id.*

[8]      *Id.*

[9]      *See* Vandergrift, Lindsey and Christopher, Paul, *Do prisoners trust the healthcare system?*, 9 Health & Justice 9 (2021), at 2 (internal citations omitted).

5.  Black people have faced long-term racial discrimination in health care.  In the first half of the 20th century, Black women were recurring victims of involuntary sterilization.[10] In 1932, the U.S. Public Health Service studied Black men with syphilis but withheld effective treatment so that they could examine how the disease would ravage those suffering from it, resulting in unnecessary deaths and transmission to others.[11]  In 1951, John Hopkins took samples from Black cancer patients without telling them, then used and sold them for millions of dollars to develop medical treatments.[12]  Today, Black patients are less likely to receive surgical intervention for serious diseases, less likely to obtain transplants, less likely to be recommended to utilize the best treatment, and receive less attention at every level of urgency.[13]  Black people are less likely to get the best quality of pain management, and are misdiagnosed at a higher rate.[14]  Black people with asthma die three times as often as white asthmas sufferers.[15]

6.  This holds true for the treatment of cancer.  Black patients who are less likely to get certain forms of cancer are nevertheless more likely to die if they contract them.[16]  They are less likely to receive the best types of surgical cancer treatment.[17]  Black people are included less frequently in innovative combination therapies or research trials.[18]  Black men—for no apparent reason—are more likely to have their testicles removed as part of prostate cancer treatment.[19]

---

[10]    *See* Feagin, Joe and Bennefield, Zinobia, *Systemic racism and U.S. health care*, Social Science & Medicine 103 at 9 (2014).

[11]    *Id.* at 9-10.

[12]    *Id.* at 10.

[13]    *Id.*

[14]    *Id.*

[15]    Okorie, Obasic et al., "I Can't Breath: Asthma, Black Men, and the Police," Scientific American (October 14, 2020) (accessed September 23, 2021), available at: https://www.scientificamerican.com/article/i-cant-breathe-asthma-black-men-and-the-police/.

[16]    *See* Feagin, *supra* at FN 8.  *See also* Esnaola, Nestor and Ford, Marvella, *Racial Differences and Disparities in Cancer Care and Outcomes: Where's the Rub?,* Surg. Oncol. Clin. N. Am. 21 at 417 (Jul. 2012), 418-19.

[17]    *Id.*

[18]    *Id.*

[19]    *Id.*

7.      There is also a significant racial disparity in how often a person experiencing a medical emergency is treated with CPR.  In affluent white neighborhoods, there is a 65% chance someone who has fallen unconscious will get CPR from the first responder; in poor black neighborhoods, there is a less than 10% chance.[20]  (There is also 30% lower likelihood Black citizens in distress will receive CPR in general, without regard to the neighborhood.[21])

8.      Mistreatment of minorities by public safety authorities resulting in asphyxiation has become a national issue in the last decade.  On August 27, 2010, a dark-skinned 11-year-old Puerto Rican girl named Briana Ojeda suffered an asthma attack while at the playground with her mother, Carmen.  Carmen panicked, put her daughter in the car, and started to drive to the nearest hospital.  As Carmen drove there, she turned onto a one-way street which was blocked, whereupon a police officer encountered her as she begged the other drivers to let her through.[22]

9.      The officer, like all officers in the New York Police Department, had been trained to perform cardiopulmonary resuscitation (CPR).[23]  Red Cross CPR training provides that if a person is in respiratory distress, medical personnel should be summoned while an open airway is maintained, and if a victim stops breathing, it is a life threatening condition and mouth to mouth ventilations must be administered.[24]  The officer detained Carmen, who asked him, "Do you know CPR?  Do you CPR?"  The officer was frustrated with her, and (according to a

---

[20]     Sasson, Comilia *et al.*, "Association of Neighborhood Characteristics with Bystander Initiated CPR," *New England Journal of Medicine* 367 at 1607-1615 (October 25, 2012).

[21]     *Id.*

[22]     CBS News/1010 WINS, *"*Brooklyn Girl Who Died From Asthma Attack Laid To Rest," newyork.cbslocal.com (September 1, 2010) (accessed November 5, 2021), available at: https://newyork.cbslocal.com/2010/09/01/family-friends-attend-funeral-for-asthmatic-bklyn-girl/.

[23]     Murphy, Matt, "Judge rules that cop is not guilty after letting 11-year-old girl die of asthma in front of him because he 'didn't feel safe' performing CPR," Daily Mail (July 29, 2016) (accessed October 30, 2021), available at: https://www.dailymail.co.uk/news/article-3714341/New-York-judge-rules-cop-let-11-year-old-girl-die-asthma-not-guilty-didn-t-feel-safe-performing-CPR-d-practised-dummy.html.  *See also* CBSNews/1010 WINS, *supra* at FN 1.

[24]     *See* American Red Cross Handbook, *CPR/AED for Professional Rescuers and Health Care Providers* (2011) at 6 and 11, available at: https://www.redcross.org/content/dam/redcross/atg/PHSS_UX_Content/CPRO_Handbook.pdf.

witness) "with a little smirk on his face," responded "No.  I don't know CPR."[25]  At that point,
Briana's lips were blue, and "you could see the girl was not breathing," but the officer "did
absolutely nothing."[26]  The officer did not report the emergency (or even any incident) to
dispatch, call 911, or escort Carmen to this hospital, and Briana was pronounced dead shortly
after her mother arrived there.[27]  Briana's death resulted in community outrage and changes to
New York's laws on the training and use of CPR.[28]

      10.    On July 17, 2014, a Black man named Eric Garner was killed in Staten Island
after a police officer put him in a chokehold.  A bystander captured the incident with their phone,
which showed the plainclothes officer attempt to handcuff Garner for selling single cigarettes as
Garner protested his innocence and said to the police officer: "Don't touch me, please."[29]  Garner
was then wrestled to the ground while surrounded by five officers, immobilized, placed in a
chokehold, and his head was pushed downward onto the concrete sidewalk.[30]  Garner's last
words before he died of asphyxiation were "I can't breathe," which he said 11 times over a
period of about 15 seconds.[31]  The officer said he held the chokehold because he was afraid they
might "crash through a glass storefront."[32]

---

[25]    *See* CBSNews/1010 WINS, *supra* at FN 18.
[26]    Yaniv, Oren and Paddock, Barry, "B'klyn ma claims cop 'did nothing,' let daughter die during an asthma attack," *New York Daily News* (August 30, 2010) (accessed October 5, 2021), available at: https://www.nydailynews.com/new-york/b-klyn-ma-claims-daughter-die-asthma-attack-article-1.202675.
[27]    *Id.*
[28]    *See* NY Senate Bill S3165B ("Briana's Law"), adopted August 27, 2017.
[29]    The video is available at: https://www.theguardian.com/us-news/video/2014/dec/04/i-cant-breathe-eric-garner-chokehold-death-video.
[30]    *Id.*
[31]    *Id.*
[32]    Baker, Al et. al., "Beyond the Chokehold: The Path to Eric Garner's Death," *New York Times* (June 13, 2015), available at: https://www.nytimes.com/2015/06/14/nyregion/eric-garner-police-chokehold-staten-island.html

11.     The New York Police Department Patrol Guide (its manual of rules) calls for officers to immediately send a person with a life-threatening medical condition, including "breathing difficulties," to the nearest hospital.[33]

12.     As Garner lay on the ground, one of the officers called an ambulance and reported that Garner "had difficulty breathing," but "did not appear to be in great distress."[34]  The call was categorized by the officer as "unknown," which is a low priority.[35]

13.     The officers on the scene did little to respond to Garner's medical distress while they waited several minutes for the ambulance to arrive.  During a later investigation, it appeared they "might have believed his pleas were part of a ruse to avoid arrest."[36]  While Garner lay on the ground, a bystander asked why the officers were not performing CPR, and one responded, "because he's breathing."[37]

14.     When the ambulance arrived, its crew had not been told of Garner's medical conditions or that police officers were involved.  They did not immediately bring a stretcher or oxygen equipment to Garner, and the first thing they did was ask "Mr. Garner to wake up, appearing to believe he was 'faking it,'" according to later grand jury testimony.[38]  There were five medical workers with in the ambulance; none of them appeared to treat the situation as though it was a medical emergency.[39]

---

[33]     *Id.*
[34]     *Id.*
[35]     *Id.*
[36]     *Id.*
[37]     CBS News/Associated Press, "'Modified duty' for medics after fatal NYC arrest," cbsnews.com (July 21, 2014) (accessed November 12, 2021), available at: https://www.cbsnews.com/news/modified-duty-for-medics-after-fatal-new-york-city-arrest/.
[38]     *See* Baker, *supra* at FN 4.
[39]     *Id.*

15.     It took 12 minutes from the first request for an ambulance to upgrade the seriousness of the situation to the highest priority level.[40]  The leader of the union for New York City emergency medical technicians (EMTs) later said, "I didn't see any real attempt initially to treat the patient."[41]

16.     On May 25, 2020, a Black man named George Floyd was killed after being detained following a 911 call suggesting that he had purchased cigarettes with a counterfeit $20 bill.[42]  Like Eric Garner, Floyd's detention was recorded by multiple cell phones.[43]  After police arrived, they struggled with him in a cruiser and pinned him to the ground, and one of the officers, Derek Chauvin, placed his knee on Floyd's neck for eight minutes and 15 seconds, even after Floyd lost consciousness, which killed him.[44]

17.     During the struggle, Floyd said, "I can't breathe" at least twice before being pinned, then repeated it 16 times on the ground while also begging "please," "mama," "I'm about to die," and "don't kill me."[45]  Chauvin told Floyd to "relax."[46]  Another officer said Floyd was "fine."[47]

18.     A bystander said on the video that Floyd was "not even resisting arrest," that he "ain't fine," that he was "not responsive right now," and told an assisting officer: "You're enjoying it.  Look at you.  Your body language explains it."[48]  The officer replied: "This is why you don't do drugs, kids."[49]

---

[40]     *Id.*
[41]     *Id.*
[42]     *See* Stein, Robin, "How George Floyd Was Killed in Police Custody," *New York Times* (May 31, 2020), available at: https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html.
[43]     *Id.* (Videos embedded.)
[44]     *Id.*
[45]     *Id.*
[46]     *Id.*
[47]     *Id.*
[48]     *Id.*
[49]     *Id.*

19.     Despite Floyd's numerous statements about being unable to breathe, the officers called for an ambulance on a non-emergency basis.[50]  The officers gave no information to first responders about Floyd's condition or whereabouts, which delayed dispatch's ability to find an available unit.[51]  Even though one of the officers checked for Floyd's pulse and found none, they did not attempt to provide him with any sort of medical assistance on the scene.[52]  Chauvin's knee remained on Floyd's neck for almost one full minute *after* the ambulance arrived, even as Floyd lay silent and motionless.[53]  He was pronounced dead shortly after arriving at the hospital.

20.     Chauvin was convicted of murder after a trial in which part of his strategy was to introduce expert testimony to show that because Floyd had a prior criminal record, Chauvin could have reasonably thought Floyd "faked his response."[54]

21.     On September 25, 2017, a 58-year-old Black man named Kenneth Johnson was ordered held without bail in the Northern State Correctional Facility in Newport, Vermont after being arrested for an alleged crime involving a complaining witness who was, on information and belief, white.  Just over two years later, on the night of December 7, while he was still waiting for trial, Johnson died of asphyxiation.

22.     Johnson's interactions with prison and medical staff in the approximately four hours beforehand were recorded by surveillance.  Just before 10:30 p.m., Johnson's cell mates saw that he was gasping for air and summoned guards and medical staff.  Johnson told them that

---

[50]     *See* Benntt et. al., "The death of George Floyd: What video and other records show about his final minutes," *The Washington Post* (May 30, 2020).
[51]     *See* Minneapolis FD Incident Report # 20-0018197 at 2, archived version available at https://web.archive.org/web/20200604091049/http://www.minneapolismn.gov/www/groups/public/@mpd/documents/webcontent/wcmsp-224680.pdf).
[52]     *See* Stein, *supra* at FN 37.
[53]     *Id.*
[54]     *See* Dewan, Shaila and Arango, Tim, "In Early Testimony for Defense, Witness Says Chauvin's Force was 'Justified'," *New York Times* (April 13, 2021), available at: https://www.nytimes.com/2021/04/13/us/george-floyd-derek-chauvin-trial-defense.html.

he was having a hard time breathing as his chest heaved and he gestured toward his throat. In response, medical staff did virtually nothing; they did not ask for a medical transport, call 911, check Johnson's airway, provide CPR, or consult with a doctor. Instead, they told him to stay in bed and relax, and the attending guard ordered that if Johnson did not "knock it off," he would be placed in solitary confinement.

23.     After everyone left, at about midnight., Johnson was found lying on the bathroom floor. A guard helped Johnson up and brought him back to bed, where Johnson began rocking back and forth and repeatedly saying "I can't breathe." The unit supervisor—who later said he was "skeptical" of Johnson—told him to "stop and behave," and again threatened to put Johnson in holding. Again, medical staff was called, and again, they did virtually nothing to try to determine the reason for Johnson's difficulty, then sent him to bed.

24.     At 2:18 a.m., Johnson was found unresponsive without a pulse, and he wasn't breathing. Johnson was given CPR and 911 was called for the first time, but it was no use. Kenneth Johnson was declared dead on arrival shortly after reaching the hospital at the age of 60.

25.     Later, one of the guards—on information and belief, the only person of color present at the scene of Johnson's medical event—told investigators that guards receive minimal training related to racial disparities in prison, and that white inmates had been sent to the emergency room when reporting similar symptoms. The incident was later investigated by Tristram Coffin, the former U.S. Attorney for the District of Vermont, who found that the incident "should not have happened," that it was reasonable to conclude that racial bias led correctional and medical staff to disbelieve Johnson, and that those staff needed to receive "regular and rigorous" training on racial bias.

**PARTIES**

26.     Plaintiff Olynthea Johnson is the sister and Administrator of the Estate of Kenneth Johnson, who prior to his death resided in County of Orleans in the State of Vermont; and whose Estate is open in the Caledonia County Superior Court – Probate Division.

27.     Defendant State of Vermont operated the prison system in which Johnson was incarcerated through its Department of Corrections (hereinafter "DOC").  DOC is required by statute to provide those in custody with health care equivalent in quality to any private medical facility in Vermont.  *See* 28 V.S.A. § 801.  DOC's offices are located in Waterbury in the County of Washington, Vermont.

28.     Defendants Robert Wright, Sirena Zahn, and Brian Mercer are employed by DOC as correctional officers.  Wright was the shift supervisor at Northern State Correctional Facility (hereinafter "NSCF"), where Johnson was being held on pretrial detention prior to his death. Zahn and Mercer were responsible for observing him in the hours before Johnson's death, and ignored obvious signs that he was suffocating or, at the very least, suffering a life-threatening emergency.

29.      Defendant Centurion of Vermont, LLC. (hereinafter "Centurion") is a foreign corporation registered to do business in the State of Vermont.  It was responsible for providing health care to inmates in the Vermont prison system at the time of Johnson's death.

30.     Defendant Steven Fisher, M.D. (hereinafter "Fisher") was at all relevant times the medical director for Centurion and ultimately responsible for Johnson's medical care and the care provided at the facility housing Johnson through other Centurion employees.

31.     Defendant Daniel Holloway, M.D. (hereinafter "Holloway") was at all relevant times a medical doctor for Centurion and was directly responsible for Johnson's medical treatment related to his difficulty breathing.

32.     Defendant Mary Martin is a nurse employed by Centurion and was responsible for Johnson's care throughout his incarceration, including on the day of his death.

33.     Defendant Michele Cardinal is a nurse employed by Centurion and was responsible for Johnson's care throughout his incarceration, including on the day of his death.

34.     Defendant Sabine Watson is a nurse employed by Centurion and was responsible for Johnson's care throughout his incarceration, including on the day of his death.

35.     Defendants Unknown Nurses (hereinafter "Nurses 1-4") are employed by Centurion and were responsible for Johnson's care throughout his incarceration, including on the day of his death.  They can be seen interacting with Johnson and taking notes during surveillance video, but they did not enter any information into Johnson's medical record, making them difficult to identify at the preliminary stage.[55]

## FACTUAL ALLEGATIONS

36.     Johnson was a Black man born on May 16, 1959.

37.     Johnson had been arrested and was detained awaiting trial from 2017 until he died.  He was held at NSCF in the months prior to his death and died there.

38.     Johnson interacted with the medical staff frequently and was well known to them, because he had diabetes and required blood sugar readings twice per day.

39.     In the fall of 2019, Johnson reported a new health issue to medical staff at NSCF: he was often short of breath, and he felt that it was due to something in his throat, as he was also

---

[55]     It is likely that some "unknown nurses" were Defendants Martin, Cardinal, or Watson.

having trouble swallowing and felt hoarse.  No provider investigated whether anything was blocking his airway or throat (or did anything other than listen to his lungs).

40.     On November 15, 2019, Johnson was sent to medical by correctional officers, because he felt particularly short of breath.  Nurse Michele Cardinal called the on-call provider, Dr. Daniel Holloway, who ordered to admit Johnson to the infirmary for observation.  Johnson was treated with a nebulizer for and prednisone for throat swelling, but (again) no provider investigated whether anything was blocking his airway or throat.

41.     On November 18, 2019, Sabine Watson, APRN saw Johnson.  He again reported that he had hoarseness in his throat, and now told her it was progressively worsening. Johnson also reported that the nebulizer to treat the shortness of breath was not alleviating his symptoms. In addition, he reported that neither he nor anyone in his family had any history of asthma.

42.     Despite this knowledge, Nurse Watson suspected Johnson had chronic obstructive pulmonary disease (COPD), a type of lung disease, and prescribed more of the same treatment he had been receiving.  She never sought examination by a doctor or specialist; nor did she investigate whether anything was blocking Johnson's airway.

43.     Johnson had never been diagnosed in the past with COPD, and there is no evidence he ever suffered from it.

44.     The medical staff nevertheless continued Johnson on treatment for COPD, even though his symptoms did not improve, and at least one nurse noted in the medical records that Johnson had trouble speaking.  His airway and throat were never examined.

45.     On November 29, 2019, Johnson reported discomfort since taking medications prescribed by prison medical for his breathing issues and said he didn't feel any improvement of his breathing issues. His airway and throat were never examined.

46.     On December 1, 2019, Kelsey Skillin ARPN (who, like all other medical staff, worked for Centurion) met with Johnson to follow up on his visit to the emergency department. Johnson reiterated that he did not think his issue with shortness of breath was originating from his lungs.  Again, he was not referred to a provider, and his airway and throat were never examined.

47.     On December 2, 2019, Johnson met with Nurse Watson.  She noted in his medical records that the albuterol nebulizer he was prescribed provided little relief, and that he reported worsening hoarseness.

48.     The following day, Johnson was admitted to the NSCF infirmary for shortness of breath.  Nurse Watson noted that his symptoms were progressing, and that staff had observed respiratory difficulty.  Nurse Watson did not refer Johnson to a doctor or specialist to diagnose the cause, and Johnson's airway and throat were never examined.

49.     On December 6, 2019, Johnson's final medical emergency began. Starting at approximately 6:00 p.m., he repeatedly asked correctional and medical staff for assistance. Many of Johnson's requests were ignored, and the required observation forms do not accurately reflect his condition or the requests he made, suggesting that he was not carefully observed in accordance with DOC protocol.

50.     At approximately 10:37 p.m., Correctional Officer Joseph Millett called by Johnson's fellow inmates housed in the infirmary, Donald Griggs and Raymond Gadreault, because they were concerned that Johnson was unable to breathe.

51.     Neither Mr. Griggs nor Mr. Gadreault were under any duty to alert anyone to Johnson's emergency, but they did, because Johnson was not being appropriately observed or assisted.

52.     Officer Millett called a "10-25," as Johnson gasped that he could not breathe. A 10-25 is when a DOC staff member initiates a facility-wide request for assistance.  However, it is not an emergency call—that is made by calling a "10-33."

53.     Defendant Nurses 1, 2, and 4 appeared and took Johnson's vital signs. Defendant Wright also appeared in order to observe.  Throughout the interaction, Johnson was breathing heavily, his chest was heaving, and he was gesturing to his throat.

54.     Defendant Nurses provided Johnson with another nebulizer treatment, even though they knew that such treatment had not succeeded thus far.  They then took his vitals, which revealed that his oxygen was low, and left. They did not check Johnson's airway, call for a consultation with a medical doctor or specialist, increase the intensity of Johnson's observation, or call 911,

55.     Defendant Wright also left without further action.

56.     From approximately 12:20 a.m. to 12:38 a.m. on December 7, 2019, Johnson repeatedly rinsed his face and neck with water. This is a sign of respiratory distress.

57.     At approximately 12:38 a.m. Defendant Brian Mercer did an observation and did not see Johnson in his bunk; he had collapsed on the floor of the bathroom adjacent to the infirmary. This bathroom is visible to the cameras, but Johnson's collapse was not discovered until Officer Mercer checked. Officer Mercer called a second 10-25.

58.     Defendant Nurses 1 and 2 and Defendant Wright arrived at the infirmary. Officer Mercer and Defendant Wright walked Johnson to his bunk from his collapse on the floor, even though Mr. Griggs had offered his wheelchair.

59.     Johnson continued to gasp for air and repeatedly stated, "I can't breathe," and told those assisting him that he was dizzy and had a headache, that he wanted oxygen, and that he

wanted to go to the emergency room. Nurses Martin and Cardinal observed from the doorway, but otherwise did nothing.

60.     Defendant Sirena Zahn was also present during this interaction. She noted that Johnson was gasping for air, could not get comfortable, and indicated towards his throat saying, "it's up here."  Still, no one sought consultation from a medical doctor or specialist, or checked Johnson's airway.

61.     During this time, Defendant Wright concluded that Johnson was faking his illness, for no apparent reason except that Wright had suffered from asthma and felt that Johnson's symptoms were inconsistent with what Wright had experienced.  He told Johnson to "knock it off" and threatened to send him to solitary confinement.

62.     Nurse Martin, without examining Johnson, also accused him of faking and told Johnson that he was "acting like a goddamn two-year-old."  She told him to stay in bed, or she would send him to a holding cell where he would have to "stand all night." Nurse Cardinal called Nurse Watson, the on-call provider, after this interaction; Nurse Watson recommended another nebulizer treatment, but did not recommend any further diagnostic referral or examination.

63.     Between the hours of approximately 12:56 a.m. and 2:07 a.m. on December 7, 2019, Johnson continued to show signs of slowly suffocating.  He repeatedly rinsed his face and neck with water, laid on the floor heaving, was doubled over the side of his bed, grabbed the sheets from his mattress, and pulled at his clothes.

64.     The other men in the infirmary later said that they did not know what to do, because they were afraid they would get in trouble if they called for help, given the prior interactions between Johnson and DOC staff that night.

65.     At approximately 1:14 a.m. on December 7, 2019, Correctional Officer Sirena Zahn conducted an observation.  Johnson was rocking back and forth on his bunk in obvious discomfort.  Officer Zahn did not call any medical or correctional staff.

66.     At approximately 1:41 a.m. on December 7, 2019, Officer Mercer conducted an observation. Johnson continued to gasp for air. Officer Mercer did not call any medical or correctional staff.

67.     At approximately 2:07 a.m. on December 7, 2019, Officer Mercer conducted an observation. Johnson was still in obvious distress. Officer Mercer did not call any medical or correctional staff.

68.     At approximately 2:08 a.m., Johnson stopped breathing and lost consciousness. Mr. Gadreault went to Johnson's bed and checked on him. Mr. Gadreault determined that Johnson was not breathing.

69.     At approximately 2:15 a.m. on December 7, 2019, Mr. Gadreault went to the infirmary window to get the nurse's attention.  He stated that Johnson was "not making the same noise he does when he is breathing."

70.     Mr. Gadreault was not under any duty to observe Johnson or alert anyone to Johnson's emergency, but he did, because no one was helping.

71.     Nurse Martin arrived and checked Johnson's vital signs for the first time in hours. He was not breathing and did not have a pulse.

72.     Johnson had been in acute respiratory distress for hours, but only at that time did anyone call 911 or attempt to perform CPR.

73.     An ambulance arrived at 2:41 a.m. The emergency technicians attempted to revive Johnson, but it was too late. Johnson was pronounced dead on arrival at 3:12 a.m. at North Country Hospital.

74.     The State Medical Examiner conducted a full autopsy report on December 8, 2019. Johnson was determined to have died of suffocating due to a tumor in his throat which had, on information and belief, grown slowly over a period of weeks or months.

75.     The tumor would have been discovered if Johnson's throat or airway had been visually examined, or if he had been referred to a specialist. But no one at the prison did so.  If they had, Johnson could have been treated appropriately, avoided unnecessary suffering, and enjoyed a longer life.

76.     The failure to examine Johnson, refer him to a specialist, or otherwise intervene was a breach of the standard of care by Defendants Centurion, Holloway and Fisher, which resulted in his injury and suffering and contributed to Johnson's death.

77.     The failure to appropriately train and supervise medical providers to respond to Johnson's symptoms, refer him to a specialist, or otherwise intervene was a breach of the standard of care by Defendants Centurion and Fisher.

78.     The conduct on the night of Johnson's death by all of the above-named individual Defendants, who were all working for the State of Vermont or Centurion at the time, amounted to deliberate indifference to his obvious medical needs.

79.     The conduct on the night of Johnson's death by all of the above-named individual Defendants, who were all working for the State of Vermont or Centurion at the time, discriminated against Johnson on the basis of his race.

80.     The failure of Defendant State of Vermont and Wright to provide training and supervision to ensure that its officers did not discriminate against prisoners based on race and took steps to ensure those suffering from life threatening emergencies received medical treatment, no matter their race, was grossly negligent.

81.     The foregoing led to substantially delayed diagnosis and effective treatment for Johnson's tumor, which led to his medical emergency, extreme pain and suffering, extreme psychological distress, and untimely death.

## COUNT I: MEDICAL MALPRACTICE

83.     Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

84.     The acts and neglects of Defendants Centurion, Fisher and Holloway were below the standard of care for a prudent health care professional engaged in a similar kind of practice, under the same or similar circumstances.

85.     As a result, Johnson was damaged as set forth in Paragraph 81.

## COUNT II: NEGLIGENCE

86.     Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

87.     Defendants Wright, Zahn, and Mercer owed a duty of care to Johnson as his custodians, and because they undertook to assist him with his medical needs.

88.     The acts and neglects of Defendants reflected a failure to exercise the same care a reasonable person would have exercised under similar circumstances, taking into account the foreseeable risk of injury caused by their actions, and actually increased the likelihood that Johnson would suffer as a result of his medical conditions.

89.     As a result, Johnson was damaged as set forth in Paragraph 81.

## COUNT III: GROSS NEGLIGENCE

90.     Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

91.     The conduct of Defendants Wright, Zahn, and Mercer on the night of Johnson's death was more than an error of judgment; it was a failure to exercise even a slight degree of care owed to another.

92.     As a result, Johnson and Plaintiff were damaged as set forth in Paragraph 81.

### COUNT IV: FAILURE TO TRAIN and SUPERVISE

93.     Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

94.     Defendants State of Vermont, Centurion, Wright, and Fisher all had a duty to train and supervise their subordinates in a responsible manner and breached that duty, knowing that the breach increased the foreseeable risk that prisoners like Johnson would be harmed.

97.      As a result, Johnson was damaged as set forth in Paragraph 81.

### COUNT V: WRONGFUL DEATH

102.    Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

103.    The acts and neglects of Defendants were the foreseeable and proximate cause of Johnson's death.

104.    As a result, Johnson was damaged as set forth in Paragraph 81.

### COUNT VI: CRUEL AND UNUSUAL PUNISHMENT

105.    Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

106.    Johnson was entitled to the right to be free from cruel and unusual punishment pursuant to the 8th Amendment to the United States Constitution and Article 18 of the Vermont Constitution.

107.    Defendants Nurses and Wright acted with deliberate indifference to Johnson's obvious medical needs, which resulted in his punishment being unnecessarily cruel in violation of his constitutional rights.

108.    As a result, Johnson was damaged as set forth in Paragraph 81.

### COUNT VIII: VIOLATION OF RIGHT TO EQUAL PROTECTION

109.    Plaintiff incorporates the foregoing paragraphs as though fully contained herein.

110.    Johnson was entitled to equal protection under the Fourteenth Amendment of the United States Constitution.

111.    Defendants treated Johnson differently than others similarly situated and there was no rational basis for the difference in treatment.

112.    As a result, Johnson was damaged as set forth in Paragraph 81.

WHEREFORE, Plaintiff requests that the Court grant compensatory and punitive damages, attorneys' fees, costs, and whatever further relief it deems appropriate.

### ENTRY ON APPEARANCE

NOW COME James Valente of Costello, Valente and Gentry, P.C., and enters his appearance for Plaintiff.

### REQUEST FOR TRIAL BY JURY

NOW COMES Plaintiff, and respectfully requests a trial by jury.

### CERTIFICATE OF MERIT

NOW COMES James A. Valente, Esq., counsel for Plaintiff, and, pursuant to 12 V.S.A. § 1042, certifies as follows:

This is a civil action to recover damages resulting from personal injury and wrongful death occurring after December 7, 2019, in which it is alleged that such injury and death resulted from the negligence of a health care provider.

I hereby certify that I have consulted with health care providers qualified pursuant to the requirements of Rule 702 of the Vermont Rules of Evidence (and any other applicable standard) and that, based on the information reasonably available at the time the opinion is rendered, the health care providers have:

1. Described the applicable standard of care;

2. Indicated that based on reasonably available evidence there is a reasonable likelihood that Plaintiff will be able to show that the defendants failed to meet the standard of care; and

3. Indicated that there is a reasonable likelihood that Plaintiff will be able to show that the defendants' failure to meet the standard of care caused Adams to be injured and decreased his life expectancy.

This certification relates to each defendant identified in the complaint.

DATED at Brattleboro, County of Windham, and State of Vermont, this 6th day of December, 2021.

By: __/s/ James A. Valente_____
James A. Valente, Esq. ERN: 4847
COSTELLO, VALENTE & GENTRY, P.C.
Attorneys for Plaintiff
51 Putney Road
P.O. Box 483
Brattleboro, VT 05302
802 257-5533
valente@cvglawoffice.com