UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 MAY 18  PM 12: 58

CLERK

BY

DEPUTY CLERK

OLYNTHEA JOHNSON,                    )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )          Case No. 22-cv-00029
                                     )
STATE OF VERMONT, DEPARTMENT OF      )
CORRECTIONS; ROBERT WRIGHT;          )
SIRENA ZAHN; BRIAN MERCER;           )
CENTURION OF VERMONT, LLC;           )
STEVEN FISHER; DANIEL HOLLOWAY;      )
MARY MARTIN; MICHELE CARDINAL;       )
SABINE WATSON; UNKNOWN NURSES,       )
                                     )
        Defendants.                  )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS**
(Docs. 17, 40, & 42)

Plaintiff Olynthea Johnson, administrator of the Estate of Kenneth Johnson, brings this action against Defendants State of Vermont, Department of Corrections (the "Vermont DOC"); Robert Wright ("Officer Wright"); Sirena Zahn ("Officer Zahn"); Brian Mercer ("Officer Mercer")[1]; Centurion of Vermont, LLC ("Centurion"); Steven Fisher, MD ("Dr. Fisher"); Daniel Holloway, MD ("Dr. Holloway"); Mary Martin ("Nurse Martin"); Michele Cardinal ("Nurse Cardinal"); Sabine Watson ("Nurse

---

[1] At oral argument on October 14, 2022, counsel for the Vermont DOC, Officer Wright, and Officer Zahn informed the court that Officer Mercer has not been served and requested that he be dismissed. The court informed counsel that he could file a written motion to that effect unless Plaintiff consented to the dismissal of Officer Mercer. Plaintiff's counsel informed the court that Officer Mercer is deceased. In the event of a party's death, Fed. R. Civ. P. 25(a)(1) provides that the court may order substitution of the party, and "[a] motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Because it has been more than ninety days since the October 14, 2022 hearing and since Plaintiff's notice of Officer Mercer's death, the court DISMISSES the action against him.

Watson"); and four nurses whose identities have not yet been ascertained ("Unknown Nurses") (collectively "Defendants").

Plaintiff's Amended Complaint (Doc. 27-2) (the "AC") alleges the following claims, all of which relate to Mr. Johnson's death while he was detained at the Northern State Correctional Facility ("NSCF") in Newport, Vermont: Count I: Medical Malpractice (against Centurion, Dr. Fisher, Dr. Holloway, Nurse Martin, Nurse Cardinal, Nurse Watson, and Unknown Nurses); Count II: Negligence (against Officer Wright, Officer Zahn, and Officer Mercer); Count III: Gross Negligence (against Officer Wright, Officer Zahn, Officer Mercer, Nurse Martin, Nurse Cardinal, Nurse Watson, and Unknown Nurses); Count IV: Failure to Train and Supervise (against Vermont DOC, Centurion, Officer Wright, and Dr. Fisher); Count V: Wrongful Death (against all Defendants); Count VI: Cruel and Unusual Punishment (against Nurse Martin, Nurse Cardinal, Nurse Watson, Unknown Nurses, and Officer Wright); Count VIII: Violation of the Right to Equal Protection (against Nurse Martin, Nurse Cardinal, Nurse Watson, Unknown Nurses, and Officer Wright).[2]

Plaintiff is represented by James A. Valente, Esq. and Zachary D. Hozid, Esq. Dr. Fisher, Nurse Cardinal, and Nurse Watson are represented by Pamela L.P. Eaton, Esq. and Stephen J. Soule, Esq. The Vermont DOC, Officer Wright, and Officer Zahn are represented by Andrew C. Boxer, Esq. and Oliver A. Abbott, Esq. Centurion and Dr. Holloway are represented by Pamela L.P. Eaton, Esq.

## I.    Procedural Background.

Plaintiff filed her original Complaint on December 6, 2021 in Vermont Superior Court. On February 7, 2022, Defendant Fisher removed the action to the District of Vermont. Nurse Cardinal, Dr. Fisher, and Nurse Watson filed a partial motion to dismiss on February 14, 2022. (Doc. 17.) The Vermont DOC, Officer Wright, and Officer Zahn filed a motion to dismiss on April 29, 2022. (Doc. 40.) Centurion and Dr. Holloway filed

---

[2] Plaintiff's counsel acknowledged at the October 14, 2022 hearing that the AC does not allege a Count VII.

2

a motion to dismiss on April 29, 2022. (Doc. 42.)

While the motions to dismiss were pending, the parties disputed whether Plaintiff could file an Amended Complaint. On February 17, 2022, Plaintiff filed a motion to amend her complaint (Doc. 19), and on March 4, 2022, Plaintiff filed a second motion to amend her complaint. (Doc. 27.) The court denied both motions without prejudice for noncompliance with Local Rule 7(a)(7). On June 6, 2022, Plaintiff re-filed her second motion to amend her complaint. (Doc. 46.) Nurse Cardinal, Centurion, Dr. Fisher, Dr. Holloway, and Nurse Watson opposed this motion on June 21, 2022 (Doc. 54), and Plaintiff replied the same day (Doc. 55). The court granted Plaintiff's motion on August 4, 2022, deeming her AC filed as of March 4, 2022.[3] *See* Doc. 64 ("Plaintiff has since complied with this court[']s Local Rules and her Amended Complaint shall be accepted and deemed filed as of March 4, 2022.").

On August 30, 2022, the court denied as moot Nurse Cardinal, Dr. Fisher, and Nurse Watson's motion to dismiss (Doc. 17) because it pertained to Plaintiff's original complaint.[4] The court heard oral arguments on October 14, 2022, at which point the court took the pending motions to dismiss under advisement.

## II.   Allegations in the AC.

On September 25, 2017, Mr. Johnson, "a 58-year-old Black man . . . was ordered held without bail in [NSCF] in Newport, Vermont[.]" (Doc. 27-2 at 8, ¶ 21.) On December 7, 2019, while awaiting trial, he died of asphyxiation. Officer Wright, Officer

---

[3] The two Amended Complaints (Doc. 27-2 and Doc. 46-2) are identical, except for ¶ 106. *Compare* Doc. 27-2, ¶ 106 ("[Mr.] Johnson was entitled to the right to be free from cruel and unusual punishment pursuant to the 14th Amendment to the United States Constitution and Article 18 of the Vermont Constitution."), *with* Doc. 27-2 at 19, ¶ 106 ("[Mr.] Johnson was entitled to the right to be free from cruel and unusual punishment and free from violations of Substantive Due Process rights pursuant to the 14th Amendment to the United States Constitution and Article 18 of the Vermont Constitution.").

[4] *See Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020) ("District courts in this Circuit have repeatedly explained that, when faced with an amended complaint, they may either deny a pending motion to dismiss as moot or consider the merits of the motion, analyzing the facts as alleged in the amended pleading.").

Zahn, and Officer Mercer are correctional officers employed by the Vermont DOC.
Officer Wright was the "shift supervisor" at NSCF, while Officers Zahn and Mercer were
"responsible for observing [Mr. Johnson] in the hours before [his] death, and ignored
obvious signs that he was suffocating or, at the very least, suffering a life-threatening
emergency." *Id.* at 10, ¶ 28. The Vermont DOC "is required by statute to provide those in
custody with health care equivalent in quality to any private medical facility in Vermont."
*Id.* at ¶ 27 (citing 28 V.S.A. § 801).

Centurion is a corporation that provides health care to inmates in the Vermont
prison system, including through its medical staff at NSCF. Dr. Fisher "was at all
relevant times the medical director for Centurion" and was "responsible for [Mr.]
Johnson's medical care and the care provided at the facility housing [Mr.] Johnson
through other Centurion employees." *Id.* at ¶ 30. Dr. Holloway was a "medical doctor for
Centurion" who was "directly responsible for [Mr.] Johnson's medical treatment related
to his difficulty breathing." *Id.* at 11, ¶ 31. Nurse Martin, Nurse Cardinal, Nurse Watson,
and Unknown Nurses were also employed by Centurion and were responsible for Mr.
Johnson's care while he was incarcerated at NSCF, "including on the day of his death."[5]
*Id.* at ¶¶ 32-35.

At NSCF, Mr. Johnson "interacted with [] medical staff frequently and was well
known to them" because he required blood sugar readings twice per day due to his
diabetes. (Doc. 27-2 at 11,¶ 38.) In the fall of 2019, Plaintiff alleges that Mr. Johnson
"reported a new health issue to medical staff at NSCF: he was often short of breath, and
he felt that it was due to something in his throat, as he was also having trouble
swallowing and felt hoarse." *Id.* at 11-12, ¶ 39.

On November 15, 2019, Mr. Johnson was "sent to medical by correctional
officers[] because he felt particularly short of breath." *Id.* at 12, ¶ 40. Nurse Cardinal

---

[5] Plaintiff notes that, based on a surveillance video taken on the night of Mr. Johnson's death,
some of the Unknown Nurses may be Nurses Martin, Cardinal, or Watson, but they are "difficult
to identify at the preliminary stage" because "they did not enter any information into [Mr.]
Johnson's medical record[.]" (Doc. 27-2 at 11, ¶ 35.)

4

called Dr. Holloway, the on-call medical treatment provider, "who ordered [her] to admit [Mr.] Johnson to the infirmary for observation." *Id.* Thereafter, Mr. Johnson was treated with a nebulizer and prednisone for "throat swelling," but providers did not "investigate[] whether anything was blocking his airway or throat." *Id.*

Three days later, on November 18, 2019, Nurse Watson saw Mr. Johnson, who reported that the "hoarseness in his throat" was "progressively worsening." *Id.* at ¶ 41. He stated that the nebulizer treatment was not alleviating his symptoms and that neither he nor anyone in his family had a history of asthma. Nurse Watson "suspected [Mr.] Johnson had chronic obstructive pulmonary disease" ("COPD") and "prescribed more of the same treatment he had been receiving." (Doc. 27-2 at 12, ¶ 42.) She did not seek an examination by a doctor or specialist, and she did not investigate whether something was blocking Mr. Johnson's airway.

NSCF medical staff continued to treat Mr. Johnson for COPD, even though he had not previously been diagnosed with COPD and although there was allegedly no evidence he suffered from it. Mr. Johnson's symptoms did not improve with COPD treatment. Plaintiff alleges that "at least one nurse noted in the medical records that [Mr.] Johnson had trouble speaking[,]" but "[h]is airway and throat were never examined." *Id.* at ¶ 44.

On November 29, 2019, Mr. Johnson "reported discomfort since taking medications prescribed by prison medical for his breathing issues and said he didn't feel any improvement[.]" *Id.* at ¶ 45. On December 1, 2019, Mr. Johnson met with Kelsey Skillin, a member of the NSCF medical staff, "to follow up on his visit to the emergency department." *Id.* at 13, ¶ 46.[6] Mr. Johnson reiterated that he did not believe his breathing issues originated from his lungs. Despite this, Mr. Johnson "was not referred to a provider, and his airway and throat were never examined." *Id.*

The next day, Mr. Johnson met with Nurse Watson, who noted in Mr. Johnson's medical records that the albuterol nebulizer prescribed to him was providing little relief and that he reported worsening hoarseness. On December 3, 2019, Mr. Johnson was

---

[6] The AC contains no other reference to a pre-November 29, 2019 emergency room visit.

5

admitted to the NSCF infirmary for shortness of breath, at which time "Nurse Watson noted that his symptoms were progressing, and that staff had observed respiratory difficulty." *Id.* at ¶ 48. Despite these observations, no intervention took place.

On December 6, 2019, at approximately 6:00 p.m., Mr. Johnson "repeatedly asked correctional and medical staff for assistance" but "[m]any of [his] requests were ignored, and the required observation forms do not accurately reflect his condition or the requests he made, suggesting that he was not carefully observed in accordance with DOC protocol." (Doc. 27-2 at 13, ¶ 49.) At approximately 10:37 p.m., two fellow infirmary inmates called Correctional Officer Joseph Millett ("Officer Millett") because they were concerned that Mr. Johnson could not breathe. Officer Millett "called a '10-25,' as [Mr.] Johnson gasped that he could not breathe." *Id.* at 14, ¶ 52. A 10-25 is a facility-wide request for assistance, but is not an emergency call, which is designated as a "10-33." *Id.* (internal quotation marks omitted). Three Unknown Nurses arrived and took Mr. Johnson's vital signs while Officer Wright observed. "Throughout the interaction, [Mr.] Johnson was breathing heavily, his chest was heaving, and he was gesturing to his throat." *Id.* at ¶ 53. The nurses provided Mr. Johnson with another nebulizer treatment, and noted that his vital signs revealed that "his oxygen was low[.]" *Id.* at ¶ 54. The nurses then allegedly left without "check[ing] [Mr.] Johnson's airway, call[ing] for a consultation with a medical doctor or specialist, increas[ing] the intensity of [Mr.] Johnson's observation, or call[ing] 911." *Id.* Officer Wright left without any further intervention.

On December 7, 2019, from approximately 12:20 a.m. to 12:38 a.m., Mr. Johnson "repeatedly rinsed his face and neck with water[,]" which Plaintiff alleges is "a sign of respiratory distress." (Doc. 27-2 at 14, ¶ 56.) At approximately 12:38 a.m., Officer Mercer discovered Mr. Johnson collapsed on the floor of the bathroom adjacent to the infirmary. Officer Mercer called another 10-25. Two Unknown Nurses and Officer Wright arrived at the infirmary, and Officers Wright and Mercer "walked [Mr.] Johnson to his bunk" even though another inmate had offered his wheelchair. *Id.* at ¶ 58. Mr. Johnson "continued to gasp for air and repeatedly stated, 'I can't breathe,' and told those

6

assisting him that he was dizzy and had a headache, that he wanted oxygen, and that he wanted to go to the emergency room." *Id.* at 14-15, ¶ 59. Nurses Martin and Cardinal observed this interaction, but allegedly did not act. Officer Zahn, who was present, noted that Mr. Johnson "was gasping for air, could not get comfortable, and indicated towards his throat saying, 'it's up here.'" *Id.* at 15, ¶ 60.

Officer Wright allegedly believed that Mr. Johnson was faking his illness, instructed him to knock it off, and "threatened to send him to solitary confinement." *Id.* at ¶ 61. Nurse Martin allegedly also accused Mr. Johnson of faking his illness, told him "that he was 'acting like a goddamn two-year-old[,]'" and instructed him "to stay in bed[] or she would send him to a holding cell where he would have to 'stand all night.'" *Id.* at ¶ 62. Following this interaction, Nurse Cardinal called Nurse Watson, who "recommended another nebulizer treatment, but did not recommend any further diagnostic referral or examination." (Doc. 27-2 at 15, ¶ 62.)

Between 12:56 a.m. and 2:07 a.m., Mr. Johnson "continued to show signs of slowly suffocating" including rinsing his face and neck with water, heaving on the floor, being "doubled over the side of his bed," grabbing the sheets off his mattress, and tugging at his clothes. *Id.* at ¶ 63. Other inmates in the infirmary were allegedly "afraid they would get in trouble if they called for help[.]" *Id.* at ¶ 64. At approximately 1:14 a.m., Officer Zahn found Mr. Johnson "rocking back and forth on his bunk in obvious discomfort" but did not call for assistance. *Id.* at 16, ¶ 65. At approximately 1:41 a.m., Officer Mercer observed Mr. Johnson gasping for air, and at 2:07 a.m., Mr. Johnson remained in distress. Officer Mercer allegedly did not call for assistance.

At approximately 2:08 a.m., Mr. Johnson "stopped breathing and lost consciousness." *Id.* at ¶ 68. Another inmate checked on Mr. Johnson at approximately 2:15 a.m., determined that Mr. Johnson was "not making the same noise he does when he is breathing[,]" and approached the infirmary window in order to get a nurse's attention. *Id.* at ¶ 70 (internal quotation marks omitted). Nurse Martin "checked [Mr.] Johnson's vital signs for the first time in hours" and determined that he "was not breathing and did not have a pulse." (Doc. 27-2 at 16, ¶ 71.) Although Mr. Johnson "had been in acute

7

respiratory distress for hours[,]" this was the first time 911 was called and CPR was attempted. *Id.* at ¶ 72. An ambulance arrived at NSCF at 2:41 a.m., but emergency technicians were unable to revive Mr. Johnson. He "was pronounced dead on arrival at 3:12 a.m. at North Country Hospital." *Id.* at 17, ¶ 73.

The State Medical Examiner conducted an autopsy and determined that Mr. Johnson "died of suffocating due to a tumor in his throat which had, on information and belief, grown slowly over a period of weeks or months." *Id.* at ¶ 74. Plaintiff asserts that Mr. Johnson's tumor would have been discovered had he been referred to a specialist or had any of his medical treatment providers examined his throat or airway. Plaintiff alleges that Defendants' conduct "led to substantially delayed diagnosis and effective treatment for [Mr.] Johnson's tumor, which led to his medical emergency, extreme pain and suffering, extreme psychological distress, and untimely death." *Id.* at 18, ¶ 81.

## III.    Surveillance Footage and Downs Rachlin Martin Investigative Report.

The Vermont DOC, Officer Wright, and Officer Zahn submitted surveillance footage from the infirmary and an investigative report prepared by the law firm Downs Rachlin Martin (the "DRM Report") with their motion to dismiss. *See* Docs. 40-1, 40-2. The DRM Report was prepared for the Vermont Agency of Human Services following Mr. Johnson's death.

At the October 14, 2022 hearing, Plaintiff's counsel agreed that the surveillance footage and DRM Report are integral to her complaint. Accordingly, the court considers both in adjudicating Defendants' motions to dismiss.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

To withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content

8

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (internal citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not judge credibility, "weigh the evidence," or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

## B.   Whether Officer Wright is Entitled to Qualified Immunity.[7]

"The doctrine of qualified immunity 'shields government officials from liability for damages on account of their performance of discretionary official functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 268 (2d Cir. 1996) (internal quotation marks and citations omitted) (quoting *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995)). Because qualified immunity is an affirmative defense, the burden is on Officer Wright to adequately plead it. *See Blissett v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995).

The Second Circuit has acknowledged that those asserting "a qualified-immunity defense at the motion to dismiss stage 'face[] a formidable hurdle[,]'" *Neary v. Wu*, 753 F. App'x 82, 84 (2d Cir. 2019) (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir.

---

[7] Plaintiff's AC asserts that Officer Wright violated Mr. Johnson's constitutional rights, but does not assert this allegation against Officer Zahn. The court thus DENIES AS MOOT Officer Zahn's motion to dismiss on the basis of qualified immunity.

2004)), because Plaintiff "is entitled to all reasonable inferences from the facts alleged, not only those that support [her] claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Nonetheless, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

### 1. Whether Qualified Immunity is Available Because Officer Wright is Not Authorized to Provide Medical Care.

Officer Wright is entitled to qualified immunity if he was acting within the scope of his official duties when the wrongful acts occurred, meaning that "*specific acts at issue* were performed within the scope of [his] official duties[,]" *Shechter*, 79 F.3d at 268, 270, and if "his alleged conduct did not violate one of the plaintiff's clearly established statutory or constitutional rights." *Id.* at 269. Conduct violates "clearly established law" only when it is clear that "every reasonable official would have understood that what he is doing violates that right." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but . . . in [] light of pre-existing law[,] the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("[T]his Court's caselaw does not require a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate.").

Officer Wright cites *Williams v. Limestone County, Alabama*, 198 F. App'x 893, 897-98 (11th Cir. 2006) and *Medley v. Shelby County, Kentucky*, 742 F. App'x 958 (6th Cir. 2018) in support of his contention that he is entitled to qualified immunity because medical decisions were not his responsibility[8] and thus his alleged failure to provide Mr.

---

[8] As support for this assertion, Officer Wright cites to Vermont's Departments of Corrections Policy No. 351, which he purportedly states that only medical personnel may make clinical decisions regarding an inmate's healthcare. This document is not part of the record before the

Johnson with adequate medical care did not constitute a violation of clearly established law. These two out-of-circuit cases are distinguishable.

In *Williams*, the court observed that a sheriff was allowed to rely on medical judgments made by medical professionals for prisoner care especially as he was not at the prison during the medical incident and did not personally observe the plaintiff's injuries. In *Medley*, the defendant deputies were not deliberately indifferent to the plaintiff's serious medical needs because they "had little to no involvement with [the defendant] or the incident at issue." *Medley*, 742 F. App'x at 961. In contrast, Officer Wright was allegedly involved throughout Mr. Johnson's medical emergency. Although he was not authorized to provide routine medical treatment, Vermont law requires DOC employees to "render emergency first aid and immediately secure additional medical care for [] inmate[s] in accordance with" prevailing medical standards "[w]hen there is reason to believe an inmate is in need of medical care[.]" 28 V.S.A. § 801(c), (a). As a result, Officer Wright is not entitled to qualified immunity solely because he was not authorized to provide medical care.

### 2.     Whether the Constitutional Rights at Issue are Clearly Established.

"It is established law that deliberate indifference to the essential medical needs of prisoners violates the Eighth Amendment's proscription against the 'unnecessary and wanton infliction of pain[.]'" *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care." *Id.*

Plaintiff alleges that on the night of Mr. Johnson's death, Officer Wright observed Mr. Johnson struggling to breathe, but did not "call for a consultation with a medical doctor or specialist, increase the intensity of Mr. Johnson's observation, or call 911." (Doc. 27-2 at 14, ¶ 54.) Two hours later, Officer Wright observed Mr. Johnson after

court, and Officer Wright does not ask the court to take judicial notice of it pursuant to Fed. R. Evid. 201(c).

Officer Mercer discovered Mr. Johnson collapsed on the bathroom floor. Officer Wright allegedly walked Mr. Johnson back to his bunk and accused Mr. Johnson of faking his symptoms, told him to "knock it off," and threatened to send him to solitary confinement. *Id.* at 15, ¶ 61.

Based on the foregoing, at the pleading stage, Plaintiff plausibly alleges that Officer Wright was personally involved in monitoring Mr. Johnson's medical needs and willfully disregarded them and that the constitutional right to be free from cruel and unusual punishment is clearly established in a correctional setting. Although Officer Wright could not be expected to render medical treatment himself, he could reasonably be expected to summon emergency medical treatment for an inmate who could not breathe. The court therefore DENIES Officer Wright's request for dismissal of the AC on qualified immunity grounds for Plaintiff's claims arising under federal law.

### 3.  Whether Officer Wright is Entitled to Qualified Immunity Under State Law.

Under Vermont law, "[q]ualified immunity attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts." *Murray v. White*, 587 A.2d 975, 978 (Vt. 1991).

"Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Id.* at 980. The Vermont Constitution prohibits cruel and unusual punishment. *See State v. Burlington Drug Co.*, 78 A. 882, 885 (Vt. 1911) ("[T]he prohibition of excessive fines and cruel and unusual punishments is, in effect, found in article 18 of the Bill of Rights[.]").

In this case, whether Officer Wright was acting in good faith is disputed. As a result, he has not yet established that he is entitled to qualified immunity under Vermont law. The court thus DENIES dismissal on qualified immunity grounds for Plaintiff's state law claims.

## C.   Whether Plaintiff Plausibly Pleads Medical Malpractice as to Dr. Fisher, Dr. Holloway, and Centurion (Count I).

In a medical malpractice action, Plaintiff must allege "that the health care providers were 'negligent and that the plaintiff's injuries were proximately caused by that negligent conduct.'" *Bittner v. Centurion of Vermont, LLC*, 2021 VT 73, ¶ 24, 215 Vt. 475, 264 A.3d 850 (quoting *Senesac v. Assocs. in Obstetrics & Gynecology*, 449 A.2d 900, 902 (Vt. 1982)). "The elements of common law negligence are: (1) defendants owed a legal duty to protect plaintiff from an unreasonable risk of harm; (2) defendants breached that duty; (3) defendants' conduct was the proximate cause of plaintiffs' injuries; and (4) plaintiffs suffered actual damage." *Knight v. Rower*, 742 A.2d 1237, 1242 (Vt. 1999)

To establish causation, medical malpractice claimants "must prove that as a result of the defendant's conduct the injuries would not otherwise have been incurred, and therefore an act or omission of the defendant cannot be considered a cause of the plaintiff's injury if the injury would probably have occurred without it." *Bittner*, 2021 VT 73, ¶ 29 (internal quotation marks omitted) (quoting *Wilkins v. Lamoille Cnty. Mental Health Servs.*, 2005 VT 121, ¶ 10, 179 Vt. 107, 889 A.2d 245).

Expert witness testimony is generally required to establish: "(1) the proper standard of medical skill and care; (2) that the defendant's conduct departed from that standard; and (3) that this conduct was the proximate cause of the harm complained of." *Id.* at ¶ 24 (internal quotation marks omitted) (quoting *Senesac*, 264 A.3d at 856).[9] Vermont law thus requires a plaintiff to file a certificate of merit "simultaneously with the filing of the complaint[,]" wherein the plaintiff or the plaintiff's attorney must:

---

[9] Although "[e]xpert testimony is generally required in medical malpractice cases because 'the human body and its treatment are extraordinarily complex subjects requiring a level of education, training and skill not generally within our common understanding[,]" *Bittner v. Centurion of Vermont, LLC*, 2021 VT 73, ¶ 25, 215 Vt. 475, 484, 264 A.3d 850, 856 (quoting *Taylor v. Fletcher Allen Health Care*, 2012 VT 86, ¶ 9, 192 Vt. 418, 60 A.3d 646), "[a]n exception to this general rule exists in cases where the violation of the standard of medical care is 'so apparent to be comprehensible to the lay trier of fact.'" *Senesac v. Assocs. in Obstetrics & Gynecology*, 449 A.2d 900, 902 (Vt. 1982) (quoting *Largess v. Tatem*, 291 A.2d 398, 403 (Vt. 1972)).

certify that he or she has consulted with a health care provider qualified
pursuant to the requirements of Rule 702 of the Vermont Rules of Evidence
and any other applicable standard, and that, based on the information
reasonably available at the time the opinion is rendered, the health care
provider has:

(1) described the applicable standard of care;

(2) indicated that based on reasonably available evidence there is a
reasonable likelihood that the plaintiff will be able to show that the
defendant failed to meet that standard of care; and

(3) indicated that there is a reasonable likelihood that the plaintiff will be
able to show that the defendant's failure to meet the standard of care caused
the plaintiff's injury.

12 V.S.A. § 1042. Failure to file a certificate of merit is grounds for dismissal, "except in
the rare instances in which a court determines that expert testimony is not required to
establish a case for medical malpractice." *Id.* § 1042(e). Plaintiff's AC contains a
certificate of merit which tracks the language of § 1042 and "relates to each defendant
identified in the complaint." *See* Doc. 27-2 at 20-21.

The AC alleges Centurion was responsible for providing healthcare to inmates in
the Vermont prison system at the time of Mr. Johnson's death. Dr. Fisher was the medical
director for Centurion and ultimately responsible for Mr. Johnson's medical care at
NSCF. Dr. Holloway "was at all relevant times a medical doctor for Centurion and was
directly responsible for [Mr.] Johnson's medical treatment related to his difficulty
breathing[,]" (Doc. 27-2 at 11, ¶ 31) and allegedly ordered Nurse Cardinal to admit Mr.
Johnson to the infirmary on November 15, 2019 for observation.

According to Plaintiff, the failure "to examine [Mr.] Johnson, refer him to a
specialist, or otherwise intervene was a breach of the standard of care" owed to Mr.
Johnson, which "resulted in [Mr. Johnson's] injury and suffering and contributed to [Mr.]
Johnson's death." *Id.* at 17, ¶ 76; *see also id.* at 18, ¶ 84 (describing Dr. Fisher, Dr.
Holloway, and Centurion's "acts and neglects" as "below the standard of care for a
prudent health care professional engaged in a similar kind of practice"). Plaintiff thus
plausibly asserts a negligence claim against Centurion, Dr. Fisher, and Dr. Holloway
(Count II).

14

### 1.    Whether Plaintiff Plausibly Pleads Medical Malpractice as to Dr. Holloway (Count I).

With regard to Dr. Holloway, Plaintiff further alleges that he was in charge of treating Mr. Johnson's respiratory distress and was aware of Mr. Johnson's condition for at least three weeks. Although Dr. Holloway is not alleged to have been present when Mr. Johnson's condition worsened, because Plaintiff alleges a delayed diagnosis caused Mr. Johnson's death, she has adequately pled a causal relationship between Dr. Holloway's alleged medical malpractice and Mr. Johnson's death. *See Gonzalez v. United States*, 612 F. Supp. 3d 336, 346 (S.D.N.Y. 2020) ("[W]here the plaintiff alleges that the defendant deviated from acceptable medical practice by negligently delaying in diagnosing a condition, proximate cause may be predicated on the theory that the defendant diminished [the patient's] chance of a better outcome or increased the injury.") (internal citations and quotation marks omitted) (second alteration in original). The court thus DENIES Dr. Holloway's motion to dismiss Plaintiff's medical malpractice claim (Count I) for failure to state a claim.

### 2.    Whether Plaintiff Plausibly Pleads Medical Malpractice as to Dr. Fisher and Centurion (Count I).

Plaintiff seeks supervisory liability against both Dr. Fisher as the medical director of Centurion and against Centurion as the employer of NSCF's medical treatment providers. Plaintiff does not allege Dr. Fisher was personally involved in Mr. Johnson's medical care.

Vermont law permits vicarious liability in medical malpractice cases in certain circumstances. *See, e.g.*, *McCormack v. Rutland Hosp., Inc.*, 2013 VT 59, ¶ 2, 194 Vt. 242, 79 A.3d 864 (affirming denial of motion for a new trial in medical malpractice suit against a doctor and against Rutland Regional Medical Center under theory of vicarious liability). Other jurisdictions have similarly found that a hospital may be vicariously liable for the malpractice of its medical professionals. *See I.M. v. United States*, 362 F. Supp. 3d 161, 198 (S.D.N.Y. 2019) (explaining that "a hospital may be vicariously liable for the medical malpractice of physicians, nurses, and other healthcare professionals who

act in an employment or agency relationship to the hospital.") (relying on New York law).

Plaintiff asserts that Centurion and Dr. Fisher had a duty to ensure Mr. Johnson received adequate medical care. Plaintiff further plausibly alleges their breach of that duty was a proximate cause of Mr. Johnson's injuries because a prompt diagnosis and treatment may have altered the course of his illness. Although a close question in light of their limited involvement and the paucity of information regarding Mr. Johnson's prognosis with prompt treatment, in the light most favorable to Plaintiff, the AC plausibly alleges a vicarious liability claim against Centurion and Dr. Fisher. The court thus DENIES their motion to dismiss Plaintiff's medical malpractice claim (Count I) for failure to state a claim.

## D.     Whether Plaintiff Plausibly Pleads Officers Wright and Zahn's Negligence (Count II) and/or Gross Negligence (Count III).

Officers Wright and Zahn seek dismissal of Plaintiff's negligence claims against them because Plaintiff has allegedly failed to identify an applicable duty of care. They further argue that Plaintiff's negligence claim is barred by the Vermont Tort Claims Act (the "VTCA") and that Plaintiff fails to plausibly allege willful conduct or gross negligence.

In a negligence case, the court must first determine that Defendants owed Mr. Johnson a duty of care because "[a]bsent a duty of care, an action for negligence fails." *Rubin v. Town of Poultney*, 721 A.2d 504, 506 (Vt. 1998). The AC alleges that Officers Wright and Zahn "owed a duty of care to [Mr.] Johnson as his custodians[] and because they undertook to assist him with his medical needs." (Doc. 27-2 at 18, ¶ 87.) Somewhat inconsistently, Plaintiff contends that Officers Wright and Zahn failed to assist Mr. Johnson with his medical needs. *See, e.g.*, *id.* at 15, ¶ 60 (alleging Officer Zahn "noted that Johnson was gasping for air, could not get comfortable, and indicated towards his throat saying, 'it's up here.' Still, no one sought consultation from a medical doctor or specialist, or checked Johnson's airway."); *id.* at ¶ 61 ("Defendant Wright concluded that Johnson was faking his illness, for no apparent reason except that Wright had suffered

16

from asthma and felt that Johnson's symptoms were inconsistent with what Wright had experienced. He told Johnson to 'knock it off' and threatened to send him to solitary confinement.").

When there is reason to believe an inmate is in need of medical care, Vermont law requires DOC employees to provide emergency first aid. *See* 28 V.S.A. § 801(c) ("When there is reason to believe an inmate is in need of medical care, the officers and employees shall render emergency first aid and immediately secure additional medical care for the inmate in accordance with the standards set forth in subsection (a) of this section."); § 801(a) ("The Department shall provide health care for inmates in accordance with the prevailing medical standards."). Plaintiff has thus plausibly alleged that Officers Wright and Zahn owed Mr. Johnson a duty of care while he was incarcerated at NSCF and while he was under their personal supervision. The court thus DENIES Officers Wright and Zahn's motion to dismiss for failure to allege a duty of care.

The VTCA provides that no cause of action may be maintained against a Vermont state employee for negligence; rather, "the exclusive right of action shall lie against the State of Vermont[.]" 12 V.S.A. § 5602. The VTCA constitutes a limited waiver of Vermont's sovereign immunity and allows tort suits to be brought "(1) solely against the State of Vermont and (2) exclusively in Vermont superior courts." *Rheaume v. Tallon*, 2009 WL 385422, at *2 (D. Vt. Feb.12, 2009); *see also* 12 V.S.A. §§ 5601(a), 5602(a). The law "does not waive Vermont's sovereign immunity such that plaintiffs may sue state employees for negligence in federal court[,]" *Breer v. Gold*, 2009 WL 249648, at *7 (D. Vt. Feb. 3, 2009), except in the case of "gross negligence or willful misconduct." 12 V.S.A. § 5602(b). Plaintiff asserts that the VTCA does not bar her negligence claim because she brings a claim for gross negligence against Officers Wright and Zahn (Count III) and because she plausibly alleges that both engaged in willful misconduct in carrying out their duty of care with regard to Mr. Johnson.

### 1.    Whether Plaintiff has Plausibly Alleged Gross Negligence.

"[G]ross negligence is 'conduct which involve[s] a gross deviation from the care that a reasonable person would have exercised in that situation.'" *State v. Carlin*, 2010

VT 79, ¶ 6, 188 Vt. 602, 9 A.3d 312 (quoting 23 V.S.A. § 1091(b)(2)) (second alteration in original). It "amounts to a failure to exercise even a slight degree of care" and requires "more than an error of judgment, momentary inattention, or loss of presence of mind." *Rivard v. Roy*, 196 A.2d 497, 500 (Vt. 1963) (internal quotation marks omitted) (quoting *Emery v. Small*, 86 A.2d 542, 543 (Vt. 1952)). In other words, Plaintiff must allege that Officers Wright and Zahn "heedlessly and palpably violated a legal duty owed to plaintiff." *Amy's Enters. v. Sorrell*, 817 A.2d 612, 616 (Vt. 2002). "Whether an individual was grossly negligent is ordinarily a jury question, except where reasonable people cannot differ." *Kane v. Lamothe*, 2007 VT 91, ¶ 12, 182 Vt. 241, 248, 936 A.2d 1303, 1309.

    *Kane* and *Kennery v. State*, 2011 VT 121, 191 Vt. 44, 38 A.3d 35, are instructive. In *Kane*, allegations that a state trooper "responded to a report of domestic violence, found a bruised and bleeding victim, interviewed her within earshot of her boyfriend, and left without arresting the boyfriend [] did not rise to the level of gross negligence as a matter of law." 2007 VT 91, ¶ 12. There, the Vermont Supreme Court reasoned that even if "the trooper might have better investigated the matter and exercised his discretion differently, [the] plaintiff nevertheless failed to set forth a wholesale absence of care or indifference to duty owed to her, as is necessary to state a viable claim for gross negligence." *Id.* at ¶ 13; *see also Powers v. Off. of Child Support*, 795 A.2d 1259, 1266 (Vt. 2002) (finding that "simple incompetence, inaccurate record keeping, and clerical errors" did not "rise to the level of gross negligence"); *Hardingham v. United Counseling Serv. of Bennington Cnty., Inc.*, 672 A.2d 480, 484 (Vt. 1995) ("[A]n error of judgment or a loss of presence of mind . . . could be viewed as negligent, but not grossly negligent.").

    In *Kennery*, state troopers responded to a woman's request to conduct a welfare check on her mother but searched the wrong house and thus failed to find an elderly woman, who collapsed on her back porch, became hypothermic, and later died. *Id.* at ¶ 7. Noting that the troopers made "multiple errors in judgment in performing a straightforward task . . . in a context where the need for particular care was great[,]" the

Vermont Supreme Court ruled that a jury could find that the troopers' conduct transcended incompetence and constituted gross negligence. *Id.* at ¶ 42.

In this case, Plaintiff contends that Officers Wright and Zahn were not simply incompetent, made clerical errors, or exercised poor judgment; rather she alleges they acted "in a context where the need for particular care was great" but made "multiple errors in judgment in performing a straightforward task," *Kennery*, 2011 VT 121, ¶ 42, which allegedly contributed to his suffering and death. Accepting the allegations in the AC as true, Plaintiff has plausibly alleged both Officers Wright and Zahn were grossly negligent. Their motion to dismiss Plaintiff's gross negligence claim (Count II) is DENIED and the VTCA does not prevent that claim from proceeding in federal court. *See Est. of Rodriguez v. Simon*, 2007 WL 2154238, at *6 (D. Vt. Mar. 30, 2007) (denying motion to dismiss gross negligence claim when plaintiff had successfully stated § 1983 claims for deliberate indifference to plaintiff's serious medical need because defendants' "alleged conduct must *a fortiori* also rise to the level of gross negligence, a state law tort.").

### 2. Whether Plaintiff has Plausibly Alleged Willful Misconduct.

For reasons similar to her gross negligence claim, Plaintiff plausibly alleges willful misconduct as a ground for finding the VTCA does not bar her negligence claims against Officers Wright and Zahn. "'Willful misconduct' is . . . 'misconduct committed voluntarily and intentionally.'" *Winfield v. Trottier*, 2009 WL 2160588, at *3 (D. Vt. July 15, 2009) (quoting Black's Law Dictionary 1014 (7th ed. 1999)). It may consist of "willful or reckless disregard for [the plaintiff's] rights;" acting "intentionally or with reckless disregard of the probability of causing . . . emotional distress;" and "gross, reckless and/or deliberate indifference to the [p]laintiffs' rights[.]" *Id.*

Plaintiff asserts that Officers Wright and Zahn witnessed Mr. Johnson in various states of extreme suffering before his death but declined to seek emergency medical treatment for him. Officer Wright allegedly observed Mr. Johnson at 10:37 p.m. when Mr. Johnson "gasped that he could not breathe." (Doc. 27-2 at 14, ¶ 52.) Officer Wright and Officer Zahn both observed Mr. Johnson again at 12:38 a.m. after he collapsed on the

infirmary's bathroom floor, at which point Mr. Johnson stated that he could not breathe, that he was dizzy, had a headache, needed oxygen, and asked to go to the emergency room. Officer Zahn witnessed Mr. Johnson again at 1:14 a.m. "rocking back and forth on his bunk in obvious discomfort" less than one hour before his death but did not call medical staff for assistance. (Doc. 27-2 at 16, ¶ 65.)

The DRM Report states that Officer Zahn, "[i]n her narrative report . . . wrote that Mr. Johnson was 'gasping for air and was unable to get comfortable [and] he indicated that it wasn't [] in his lung and reached to his neck and said[,] 'it's up here.''" (Doc. 40-2 at 16 n.7.)

Because at the pleading stage Plaintiff plausibly alleges willful misconduct, under the VTCA, Plaintiff's negligence claim need not be dismissed. Accordingly, the court DENIES Officers Wright and Zahn's motion to dismiss Count II under the VTCA.

### 3. Whether Plaintiff Plausibly Alleges a Negligent Undertaking.

Plaintiff gains less traction with her alternative theory of liability based upon a negligent undertaking. She alleges that Officers Wright and Zahn "undertook to assist [Mr. Johnson]" with his medical needs," (Doc. 27-2 at 18, ¶ 87) and may be liable pursuant to Restatement (Second) of Torts § 324A, which Vermont adopted in *Derosia v. Liberty Mutual Insurance Co.*, 583 A.2d 881, 883 (Vt. 1990), and which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A. Section 324A requires an undertaking to render services for another for the protection of a third party, and "very little action" is required

to constitute an undertaking. Even "a promise to do something may be sufficient." *Kennery*, 2011 VT 121, ¶ 14.

While Plaintiff alleges that Officers Wright and Zahn both ignored signs that Mr. Johnson was suffering a life-threatening emergency, she does not contend that Officers Wright or Zahn attempted to provide Mr. Johnson with any medical treatment. To the contrary, she contends they failed to do so. The AC thus fails to plausibly allege that either officer voluntarily undertook to render a service to Mr. Johnson. The court thus agrees that this alternative theory of liability is unavailable.

## E.     Whether Plaintiff's Wrongful Death Claim (Count V) Must be Dismissed.

The Vermont DOC and Officers Wright and Zahn seek dismissal of Plaintiff's wrongful death claim on the basis that there is no independent cause of action for wrongful death in Vermont. According to Plaintiff, her wrongful death claim "is not intended to state a cause based on facts different from the personal injury action[.]" (Doc. 45 at 12.)

Vermont's wrongful death statute does not create an independent cause of action, but rather provides "a right of recovery to a decedent's estate based on the injury to the deceased." *Fortunati v. Campagne*, 681 F. Supp. 2d 528, 546 (D. Vt. 2009) (citing Vt. Stat. Ann. Tit. 14, § 1491 (2008)). A plaintiff must "allege and prove a traditional claim for injury—in state tort law or otherwise—in order to recover." *Id.* The statute is "remedial in nature" and intended to "alleviate the harsh common law rule of no liability" when the injured party has died. *Vaillancourt v. Med. Ctr. Hosp. of Vt., Inc.*, 425 A.2d 92, 94 (Vt. 1980). The wrongful death statute "is not limited to acts of negligence" but includes "the wrongful act, neglect[,] or default of another[.]" *Clymer v. Webster*, 596 A.2d 905, 910 (Vt. 1991) (internal quotation marks omitted) (quoting *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 540 (Me. 1986)).

Because Plaintiff concedes her wrongful death claim merely requests a remedy, there is no need to dismiss Count V. All parties recognize it is not a separate cause of action.

21

**F.    Whether Plaintiff Plausibly Pleads § 1983 Claims Against Dr. Fisher, Nurse Cardinal, Nurse Watson, Officer Wright, the Vermont DOC, and Centurion.**

The AC asserts violations of Mr. Johnson's rights under the Equal Protection Clause of the United States Constitution, alleging that Nurses Martin, Cardinal, Watson, Unknown Nurses, and Officer Wright discriminated against Mr. Johnson on the basis of his race. The AC asserts a separate claim under the Due Process Clause, alleging that these same defendants acted with deliberate indifference to Mr. Johnson's serious medical needs. Plaintiff further alleges that the Vermont DOC, Centurion, Officer Wright, and Dr. Fisher failed to train or supervise their subordinates. Although the AC does not cite 42 U.S.C. § 1983, it appears Plaintiff's federal constitutional claims are brought thereunder.

42 U.S.C. § 1983 "is not itself a source of substantive rights" but provides "a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 255 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A § 1983 claimant must allege the violation or deprivation of a federal right committed by a person acting "under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). In addition, a § 1983 claimant "must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

The Fourteenth Amendment, the Equal Protection Clause, and § 1983 each include a state action requirement. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter

how discriminatory or wrongful[.]'") (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

In *Monell v. Department of Social Services*, the Supreme Court held that municipalities may be sued under § 1983 if the plaintiff can prove "the existence of a municipal policy or custom . . . to show that the municipality took some action that caused his injuries" and "a causal connection . . . between the policy and the deprivation of his constitutional rights." *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). "'Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, caselaw . . . has extended the *Monell* doctrine to private § 1983 defendants' acting under color of state law." *Tutora v. Aramark Corr. Servs.*, 2022 WL 2237567, at *6 (S.D.N.Y. June 22, 2022) (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003)).

The Vermont DOC, a state agency, does not constitute a municipal government for *Monell* liability. *See Oren v. Pennsylvania Dep't of Corrs.*, 2022 WL 710188, at *4 (M.D. Pa. Mar. 9, 2022) ("[I]t is well established that *Monell* liability is limited to municipalities, and state agencies such as the DOC are immune from § 1983 liability under the Eleventh Amendment."); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.54 (1978) ("Our holding today is, of course, limited to local government units which are *not* considered part of the State for Eleventh Amendment purposes.") (emphasis added). The court thus GRANTS the Vermont DOC's motion to dismiss Plaintiff's § 1983 federal constitutional claims (Count IV) against it.

Centurion is not a municipal government, but a private actor "may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations [p]laced upon state action." *Perez v. Sugarman*, 499 F.2d 761, 764 (2d Cir. 1974) (internal quotation marks omitted) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). State action exists "in the exercise by a private entity of powers traditionally exclusively reserved to the State[,]" *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974), including "running and providing services to a jail[.]" *Tutora*, 2022 WL 2237567, at *5; *see also Bess v. City of New York*, 2013

23

WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, [a private medical contractor] performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality"); *Mercado v. City of New York*, 2011 WL 6057839, at *7 n.10 (S.D.N.Y. Dec. 5, 2011) ("Corporate entities[] like [private medical providers] are treated the same as a municipality when performing the public function of running a jail.").

Private corporations are generally not liable under § 1983, but private corporations acting under color of state law may be liable for the failure to train or supervise employees if that failure amounts to deliberate indifference to federal rights. *See Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990) (explaining that private employers may be liable under § 1983 for the constitutional torts of their employees if the plaintiff can prove that acts or omissions pursuant to an official policy caused the constitutional tort). Centurion may therefore be liable under § 1983 if Plaintiff states a constitutional claim for which relief may be granted.

### 1. Whether Plaintiff Plausibly Pleads an Equal Protection Claim Against Nurse Cardinal, Nurse Watson, and Officer Wright (Count VIII).

Nurse Cardinal, Nurse Watson, and Officer Wright[10] seek dismissal of Plaintiff's Equal Protection claim against them because Plaintiff has not adequately alleged that they treated Mr. Johnson differently on the basis of his race or had the requisite discriminatory intent. "To prove a violation of the Equal Protection Clause, . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

---

[10] Unlike in her original Complaint, in the AC, Plaintiff does not allege Equal Protection claims against Officer Zahn, Centurion, or Dr. Holloway. The court therefore DENIES AS MOOT those Defendants' motion to dismiss that claim.

429 U.S. 252, 265 (1977). A plaintiff, however, need not "prove that the challenged action rested solely on racially discriminatory purposes." *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. A court may consider, among other things, "a clear pattern, unexplainable on grounds other than race" as well as the "historical background of the decision[.]" *Id.* at 266-67. "The specific sequence of events leading up to the challenged decision also may shed some light on the [state actor's] purposes." *Id.* at 267.

Plaintiff asserts that on the night of his death, Mr. Johnson was discriminated against on the basis of his race because a correctional guard "told investigators . . . that white inmates had been sent to the emergency room when reporting . . . symptoms" similar to Mr. Johnson's. (Doc. 27-2 at 9, ¶ 25.) The DRM Report addresses this contention less conclusively as follows:

> Officer Mercer could not opine with certainty about whether race played a factor in DOC's treatment of Mr. Johnson. He stated that he believed medical personnel were genuinely trying to help Mr. Johnson. On the other hand, in the past he had seen white inmates brought to the emergency room. Officer Mercer described the question as a "big if," and stated that he could not be certain, but acknowledged that race could have been a factor.

(Doc. 40-2 at 16-17.) The DRM Report nonetheless recommended that the DOC implement implicit bias training, noting:

> Mr. Johnson—a person of color—was under the supervision and care of an almost entirely white staff, a number of whom apparently disbelieved his persistent and credible claims that he could not breathe and failed to respond to those claims in a manner that ensured his safety. Given these circumstances, it [is] reasonable to conclude that implicit bias likely played a role in shaping staff's reaction to Mr. Johnson's medical crisis. A number of the DOC Officers that DRM interviewed stated that they had not received implicit bias training from DOC. A DOC supervisor explicitly disclaimed knowledge of the concept of implicit bias. DOC should provide all its staff with regular and rigorous training on implicit bias.

(Doc. 40-2 at 38.)

Plaintiff alleges that Nurse Cardinal, Nurse Watson, and Officer Wright all either witnessed Mr. Johnson's symptoms of extreme respiratory distress, physical discomfort,

and mental anguish firsthand or were made aware of Mr. Johnson's condition and yet none of them referred Mr. Johnson to a specialist, called 911, or examined Mr. Johnson's airway. Plaintiff does not cite any statistics demonstrating a racial disparity, allege any racially discriminatory comments, nor cites any evidence of discriminatory intent other than Officer Mercer's speculation that race may have been a factor. Against this backdrop, Plaintiff has not plausibly alleged that Nurse Cardinal, Nurse Watson, and Officer Wright discriminated against Mr. Johnson based on his race. Although discovery may yield factual and statistical evidence that bolsters or undercuts an Equal Protection claim, at this point the AC's allegations are too scant to state a claim for which relief may be granted.[11] Fed. R. Civ. P. 12(b)(6).

For the reasons stated above, the court GRANTS Nurse Cardinal, Nurse Watson, and Officer Wright's motions to dismiss Plaintiff's Equal Protection Claim (Count VIII) of the AC without prejudice.

### 2.    Whether Plaintiff Plausibly Pleads that Nurse Cardinal and Officer Wright Were Deliberately Indifferent to Mr. Johnson's Serious Medical Needs (Count VI).

The AC alleges a violation of Mr. Johnson's right to be free from cruel and unusual punishment pursuant to the Fourteenth Amendment of the United States Constitution.[12] In *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), the Supreme Court held that to state a § 1983 claim under the Eighth Amendment's Cruel and Unusual Punishment Clause, a convicted prisoner must establish that the state was deliberately

---

[11] *C.f. Barnes v. Ross*, 926 F. Supp. 2d 499, 507 (S.D.N.Y. 2013) (holding that plaintiff plausibly pled an Equal Protection claim when he alleged that "minority inmates . . . received mental-health care that differed from the care provided to white inmates"); *see also Mitchell v. Washington*, 818 F.3d 436, 445 (9th Cir. 2016) (holding that plaintiff plausibly pled that medical provider "employed an explicit racial classification" when denying plaintiff's request for certain medical treatments, stating that those treatments "did not work on African Americans.").

[12] Plaintiff originally brought this claim pursuant to the Eighth Amendment to the United States Constitution which applies to individuals who have been convicted of a crime. Nurse Cardinal, Nurse Watson, Officer Wright, Centurion, and Dr. Holloway moved to dismiss due to Mr. Johnson's status as a pretrial detainee. Because Plaintiff has amended her claim, the court DENIES AS MOOT their motion to dismiss Plaintiff's original claim.

26

indifferent to his or her serious medical needs. In *County of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983), the Court held that the rights of pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner[,]" however, "[a] pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). As the Second Circuit observed in *Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019):

> It is well established that when the state takes a person into custody, severely limiting his ability to care for himself, and then is deliberately indifferent to his medical needs, the . . . proscription against the unnecessary and wanton infliction of pain is violated. That is true whether the deliberate indifference is manifested by prison doctors in their response to the prisoner's needs, or by prison guards who intentionally deny or delay access to medical care or intentionally deny or delay access to the treatment once prescribed.

*Id.* (citing *Estelle*, 429 U.S. at 104-05). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.

A "serious medical need" is one that requires urgent treatment and may result in "death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). It may also arise where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain[.]'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).

To assess seriousness, courts consider "whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition

significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles*, 925 F.3d at 86 (citing *Chance*, 143 F.3d at 702). The conditions "must be evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30. "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

"A plaintiff can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety.'" *Charles*, 925 F.3d at 87 (quoting *Darnell*, 849 F.3d at 35) (alteration in original). "[C]ertain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm[.]'" *Hathaway*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)). As a result, a delay in medical care may establish deliberate indifference to medical needs, but "a prisoner's [constitutional] rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment[.]'" *Rodriguez v. Ames*, 224 F. Supp. 2d 555, 561 (W.D.N.Y. 2002) (quoting *Rodriguez v. Mercado*, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002)).

Prior to his death, Mr. Johnson "laid on the floor heaving, was doubled over the side of his bed, grabbed the sheets from his mattress, and pulled at his clothes." (Doc. 27-2 at 15, ¶ 63.) Surveillance footage depicts Mr. Johnson collapsed on the bathroom floor, communicating with corrections and medical staff, gesturing towards his throat, and writhing in discomfort. Accepting the alleged facts as true, Plaintiff plausibly alleges Mr.

Johnson had a "serious medical need" which a reasonable person would find important and worthy of immediate medical treatment.[13]

Plaintiff further asserts Officer Wright told Mr. Johnson to "knock it off" and threatened to send him to solitary confinement while Nurse Cardinal observed from a doorway. In such circumstances, Plaintiff plausibly alleges Officer Wright and Nurse Cardinal knew or reasonably should have known that failure to provide emergency medical treatment would pose a substantial risk to Mr. Johnson's health.[14] Although Officer Wright is not authorized to provide medical treatment, and although Mr. Johnson was not diagnosed prior to his medical emergency, Vermont law required Officer Wright to "render emergency first aid and immediately secure additional medical care for" Mr. Johnson "in accordance with the prevailing medical standards." 28 V.S.A. § 801(c), (a).

---

[13] Courts have refused to dismiss a cause of action on less egregious facts. *See, e.g.*, *Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994) (holding plaintiff's degenerative hip condition which required corrective surgery prior to incarceration and which caused pain which went unremedied was sufficient to allege deliberate indifference); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (holding that plaintiff who claimed that "he suffered extreme pain, his teeth deteriorated, and he [was] unable to eat properly" adequately alleged serious medical needs); *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (finding "serious medical need" when plaintiff alleged that treatment of Hepatitis C was inadequate and prison officials denied requests of defendant's doctors to prescribe different treatment after relapse); *cf. Yancey v. Robinson*, 828 F. App'x 801, 803 (2d Cir. 2020) (finding no "serious medical need" despite plaintiff's complaint of respiratory distress when medical records were consistent with allergic reaction and plaintiff was given Benadryl for hives).

[14] *See Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019) ("A plaintiff can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety.'") (alteration in original); *see also Beatty v. Davidson*, 713 F. Supp. 2d 167, 175-76 (W.D.N.Y. 2010) (finding deliberate indifference to insulin-dependent diabetic plaintiff who went without insulin for 24 hours despite repeated requests, was "so thirsty that he drank from a toilet," and "complained of feeling sick and dehydrated" when nurse did not follow policies and procedures for insulin-dependent diabetics, "did not start an insulin administration sheet[,]" did not give him food, and where it is disputed whether she gave the plaintiff insulin); *Boomer v. Lanigan*, 2002 WL 31413804, at *7 (S.D.N.Y. Oct. 25, 2002) ("Ignoring requests for medical care made by a prisoner known to be an epileptic may constitute deliberate indifference to serious medical needs, particularly when it is undisputed that the inmate suffered a seizure after making those requests.").

At this stage, it is not necessary for Plaintiff to plead that Nurse Cardinal and Officer Wright knew Mr. Johnson's precise medical diagnosis in light of his demonstrated medical need.

For the reasons stated above, the court DENIES Nurse Cardinal's and Officer Wright's motions to dismiss Plaintiff's cruel and unusual punishment claim under the Fourteenth Amendment (Count VI).

### 3. Whether Plaintiff Plausibly Pleads that Nurse Watson Was Deliberately Indifferent to Mr. Johnson's Serious Medical Needs (Count VI).

Plaintiff alleges that Nurse Watson treated Mr. Johnson on the days preceding his medical emergency, including on November 28, 2019; December 2, 2019; and December 3, 2019, but not on the day or night of his death. Plaintiff asserts that Mr. Johnson repeatedly informed Nurse Watson that his symptoms were worsening and that the nebulizer treatment was not providing relief. Nurse Watson allegedly noted that Mr. Johnson's symptoms were progressing and that staff had observed his respiratory distress, yet failed to seek "examination by a doctor or specialist; nor did she investigate whether anything was blocking [Mr.] Johnson's airway." (Doc. 27-2 at 12, ¶ 42.) Nurse Watson was on call the night of Mr. Johnson's death, and Nurse Cardinal contacted her after Mr. Johnson's collapse on the bathroom floor. Plaintiff alleges that Nurse Watson "recommended another nebulizer treatment, but did not recommend any further diagnostic referral or examination." *Id.* at 15, ¶ 62.

Based on the foregoing, although a close question with regard to the requisite need for personal involvement, Plaintiff adequately alleges that Nurse Watson acted recklessly with regard to the risk posed by Mr. Johnson's condition, and that she either knew or should have known her alleged failure to act posed a serious risk to his health. Plaintiff has therefore alleged Nurse Watson's deliberate indifference. *See Lloyd v. Lee*, 570 F. Supp. 2d 556, 569 (S.D.N.Y. 2008) (finding plaintiff plausibly alleged deliberate indifference from failure of prison doctors to provide plaintiff with an MRI for nearly nine months from the time it was initially requested); *Hathaway v. Coughlin*, 37 F.3d 63,

67-68 (2d Cir. 1994) (finding deliberate indifference when prison doctor did not inform plaintiff that he had two broken pins in his hip for a year following x-ray); *Stevens v. Goord*, 535 F. Supp. 2d 373, 388-89 (S.D.N.Y. 2008) (finding doctor's "decision to declare [p]laintiff's condition 'untreatable' rather than refer [p]laintiff to a specialist, particularly given the pain and discomfort that [p]laintiff continued to suffer for approximately eight additional months . . . goes beyond mere 'negligence' and serves as an additional basis for" plaintiff's Eighth Amendment claim). The court thus DENIES Nurse Watson's motion to dismiss Plaintiff's cruel and unusual punishment claim pursuant to the United States Constitution (Count VI).[15]

### 4.    Whether Plaintiff's Cruel and Unusual Punishment Claim Under Vermont's Constitution Should be Dismissed.

Plaintiff asserts a violation of Chapter I, Article 18 of the Vermont Constitution, which provides:

> That frequent recurrence to fundamental principles, and a firm adherence to justice, moderation, temperance, industry, and frugality, are absolutely necessary to preserve the blessings of liberty, and keep government free; the people ought, therefore to pay particular attention to these points, in the choice of officers and representatives, and have a right, in a legal way, to exact a due and constant regard to them, from their legislators and magistrates, in making and executing such laws as are necessary for the good government of the State.

VT Const. Ch. I, Art. 18.[16]

Nurse Cardinal and Nurse Watson seek dismissal on the ground that Article 18 is not self-executing and must be pled as part of a Chapter II, § 39 violation of the Vermont Constitution, which provides:

---

[15] As Plaintiff does not allege a cruel and unusual punishment claim against Centurion or Dr. Holloway under either the federal or Vermont Constitution, the court DENIES AS MOOT their motion to dismiss on this basis.

[16] The Vermont Supreme Court has declined to address whether the Vermont Constitution offered more protection against cruel and unusual punishment than the U.S. Constitution. *See Bain v. Hofmann*, 2010 VT 18, ¶¶ 7-8, 187 Vt. 605, 606, 993 A.2d 432, 435 ("We do not address any of plaintiff's arguments that are raised for the first time on appeal. . . . This includes plaintiff's assertion that the state constitution provides him greater protection against 'cruel and unusual punishment' than the Eighth Amendment[.]").

> All prosecutions shall commence, *By the authority of the State of Vermont*.
> All Indictments shall conclude with these words, *against the peace and
> dignity of the State*. And all fines shall be proportioned to the offences.

VT Const. Ch. II, § 39.

To determine whether a constitutional provision is self-executing, the Vermont

Supreme Court applies "certain relevant criteria, no one of which is dispositive." *Shields

v. Gerhart*, 658 A.2d 924, 928 (Vt. 1995).

> First, a self-executing provision should do more than express only general
> principles; it may describe the right in detail, including the means for its
> enjoyment and protection. *See Convention Center Referendum Comm. v.
> Board of Elections & Ethics*, 399 A.2d 550, 552 (D.C. Ct. App. 1979).
> Ordinarily a self-executing provision does not contain a directive to the
> legislature for further action. *Id.* The legislative history may be particularly
> informative as to the provision's intended operation. *Id.* Finally, a decision
> for or against self-execution must harmonize with the scheme of rights
> established in the constitution as a whole.

*Id.*

In assessing the first factor, the Vermont Supreme Court has held that its

constitutional provisions which express "truism[s] of a republican form of government"

but "provide[] no private right of action" are not self-executing. *Welch v. Seery*, 411 A.2d

1351, 1352 (Vt. 1980); *see also id.* (holding that constitutional article providing all power

is inherent in and derived from the people and governmental officers are legally

accountable to the people is a truism and does not provide a right of action where "[t]he

remedy contemplated by it is that of popular election.").[17]

---

[17] *See also Shields v. Gerhart*, 658 A.2d 924, 928 (Vt. 1995) (holding that article of Vermont's
Constitution which identifies right to possess and protect property among certain natural,
inherent, and unalienable rights "expresses fundamental, general principles" and "does not
establish an enforceable property right, but merely lists it to flesh out philosophical truisms.");
*Paige v. State*, 2018 WL 11418475, at *7 (Vt. Super. Mar. 15, 2018) (ruling that "the verbiage of
Article 18, regarding the 'fundamental principles . . . [o]f justice, moderation, temperance,
industry, and frugality . . . to preserve the blessings of liberty,' 'is but a truism' and therefore
'provides no right of action' in and of itself" and concluding that Article 18 "standing alone []
does not convey sufficiently clear enforceable rights on its own, at least in the area of taxation
challenges.").

In *Godin v. Corrections Corp. of America*, the plaintiffs brought a cruel and unusual punishment claim pursuant to both Article 18 and § 39. The Vermont Superior Court concluded that the two provisions together prohibit cruel and unusual punishments and are self-executing. 2017 WL 7052186, at *13-14 (Vt. Super. Aug. 25, 2017); *see id* at *14. ("Thus the Court finds that Article 18 and Section 39, read together to prohibit the imposition of cruel and unusual punishments, are self-executing."). In reaching this conclusion, the court reasoned that while "Article 18 appears to state only general principles, which argues against its being interpreted as self-executing[,] [§] 39 . . . appears to state more than mere general principles, and sets forth a specific right in that 'all fines shall be proportioned to the offences.'" *Id.* The *Godin* court's analysis relied on *State v. Burlington Drug Co.*, wherein the Vermont Supreme Court discussed § 39 and its relationship with Article 18:

> The provision of article 8, in amendment of the federal constitution, forbidding excessive fines and cruel and unusual punishments, was not directed to, and does not operate upon, the state government. . . . After the adoption of the fourteenth amendment, the view was taken . . . that by virtue of the eighth was interposed against the state government. . . . The provision of our state Constitution to which we have been particularly referred is that "all fines shall be proportioned to the offenses." . . .
>
> [I]f it is not warrantable to say that the word "fines" in [§ 39 of the Vermont] Constitution refers to all punishments whether by fine or imprisonment or forfeiture or disqualification, still our Bill of Rights is not behind any in its assertion of the fundamental principles of free government, and *the prohibition of* excessive fines and *cruel and unusual punishments* is, in effect, found in article 18 of the Bill of Rights, which exacts from legislators and magistrates a constant regard and a firm adherence to the fundamental principles of justice and moderation in the making and in the execution of laws.

78 A. at 884-85 (emphasis supplied).

As there is no controlling precedent from the Vermont Supreme Court as to how to plead a cruel and unusual punishment claim under the Vermont Constitution, this court must predict how it would rule when faced with this question. *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 71 (2d Cir. 2000) ("Where there is no

decision of a state's highest court directly, this court may look to any sources on which the state's highest court might rely in order to determine what that court may decide.").

Article 18 expresses a "truism of a republican form of government," *Welch*, 411 A.2d at 1352, by acknowledging a constant regard and firm adherence to the fundamental principles of justice and moderation in the making and in the execution of laws, which it exacts "from legislators and magistrates[.]" Vt. Const. Ch. I, Art. 18. It neither indicates an intent to "provide[] [a] private right of action," nor articulates any means of doing so. *Godin*, 2017 WL 7052186, at *6. To find that right, the court must look elsewhere in Vermont's Constitution. Although § 39 of the Vermont Constitution does not mention cruel and unusual punishment, it is undisputed that the Vermont Supreme Court has found that it includes that claim. *See Burlington Drug Co.*, 78 A. at 884-85.

In the AC, regardless of how the claim is framed, it is clear Plaintiff asserts a cruel and unusual punishment claim under Vermont's Constitution. Since no party disputes that such a claim exists, it exalts form over substance to dismiss the claim for the arguable lack of a citation to another constitutional provision. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) ("[T]he failure in a complaint to cite a statute, or cite the correct one, in no way affects the merits of a claim, because factual allegations alone are what matters.") (quoting *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 104 (2d Cir. 2005) (internal quotation marks omitted)). The court thus DENIES Nurse Cardinal, Nurse Watson, and Officer Wright's motions to dismiss Plaintiff's Article 18 claim.

**5.    Whether Plaintiff Plausibly Pleads a § 1983 Failure to Train and Supervise Claim against Officer Wright, Centurion, and Dr. Fisher (Count IV).**

Plaintiff alleges that the Vermont DOC,[18] Officer Wright, Centurion, and Dr. Fisher "had a duty to train and supervise their subordinates in a reasonable manner and breached that duty, knowing that the breach increased the foreseeable risk that prisoners

---

[18] The court has previously dismissed Plaintiff's § 1983 claims against the Vermont DOC as it is immune from liability under the Eleventh Amendment.

like [Mr.] Johnson would be harmed." (Doc. 27-2 at 19, ¶ 94); *see also id.* at 17, ¶ 77
("The failure to appropriately train and supervise medical providers to respond to [Mr.]
Johnson's symptoms, refer him to a specialist, or otherwise intervene was a breach of the
standard of care by Defendants Centurion and Fisher."); *id.* at 18, ¶ 80 ("The failure of
Defendant[s] [Vermont DOC] and [Officer] Wright to provide training and supervision to
ensure that its officers did not discriminate against prisoners based on race and took steps
to ensure those suffering from life threatening emergencies received medical treatment,
no matter their race, was grossly negligent."). The AC does not indicate whether this
claim is brought under the state or federal constitution, and it remains bare bones and
formulaic even when incorporating by reference the preceding allegations.

Officer Wright seeks dismissal of this claim, arguing that Plaintiff has failed to
plead the elements of a § 1983 claim because Plaintiff does not allege that he knew with a
moral certainty that he would confront a particular situation, nor that there is a history of
constitutional violations of the same nature. He also argues that Plaintiff has failed to
allege that the failure to train and supervise resulted in a violation of Mr. Johnson's
constitutional rights. Dr. Fisher and Centurion seek dismissal of this claim because
allegations about their personal involvement are too vague and conclusory to state a
claim against them.

In response, Plaintiff asserts that her failure to train and supervise claim is brought
not only under § 1983 but also under the Restatement (Second) of Torts § 317 and the
Restatement (Second) of Agency § 213(c) in addition to § 1983. *See* Doc. 45 at 11
("Defendants attack this claim as if it is made exclusively under 42 U.S.C. § 1983, but it
is not. When third parties are injured by negligent supervision, they have a claim for
damages flowing from that negligence pursuant to Restatement (Second) of Torts § 317
and Restatement (Second) of Agency § 213(c).").[19] Plaintiff may not amend the AC

---

[19] Restatement (Second) of Torts § 317 applies when a "servant [is] acting outside the scope of
his employment[.]" Because Plaintiff has not plausibly alleged that Officer Wright or Dr. Fisher
were acting outside the scope of their respective employment on the night of Mr. Johnson's
death, § 317 does not apply. Restatement (Second) of Agency § 213 provides that "[a] person

35

through her brief. *See Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F.
App'x 17, 20 (2d Cir. 2020) (stating a plaintiff may not amend her claims by "advocating
a different theory of liability in an opposition brief wholly unsupported by factual
allegations in the complaint[]") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178
(2d Cir. 1998)).

    With regard to Plaintiff's § 1983 claims against Centurion, although *Monell*
addressed municipal liability, the ruling has been extended to private employers in
limited circumstances. "Private employers are not liable under § 1983 for the
constitutional torts of their employees unless the plaintiff proves that 'action pursuant to
official . . . policy of some nature caused a constitutional tort.'" *Rojas*, 924 F.2d at 409
(quoting *Monell*, 436 U.S. at 691) (internal citations omitted); *see also Shields v. Ill.
Dep't of Corrs.*, 746 F.3d 782, 790 (7th Cir. 2014) ("In a number of decisions since
*Monell*, our court has applied the *Monell* standard to private corporations. . . . All other
circuits that have addressed the issue have reached the same conclusion[.]") (collecting
cases). Courts including this one have extended *Monell* to a private corporation such as
Centurion because "Centurion is arguably more than a mere private corporation, as it
provides medical care to prisoners on behalf of the State of Vermont." *Bedard v.
Centurion of Vermont, LLC*, 2021 WL 4699245, at \*3 (D. Vt. Aug. 27, 2021) (collecting
cases); *see also Swinton v. Corr. Med. Care, Inc.*, 2020 WL 9607024, at \*10 (W.D.N.Y.
Dec. 22, 2020) ("[T]he *Monell* requirements for liability also apply to municipal
contractors like [the defendant] which, as the medical provider at [Monroe County Jail],
'performs a function traditionally within the exclusive prerogative of the state.'")
(internal quotation marks omitted) (quoting *McNeil v. Corr. Med. Care*, 2019 WL
4415528, at \*9 (N.D.N.Y. Sept. 16, 2019)).

    To state a § 1983 claim against Centurion, Plaintiff must allege it had an official
policy or custom that caused a violation of Mr. Johnson's constitutional rights. *See Fisk
v. Letterman*, 401 F. Supp. 2d 362, 375 (S.D.N.Y. 2005) ("[A] private corporation could

---

conducting an activity through servants or other agents is subject to liability for harm resulting
from his conduct if he is negligent or reckless" under certain circumstances.

be held liable under [§] 1983 for its own unconstitutional policies. . . . Therefore, a plaintiff must prove that 'action pursuant to official policy of some nature caused a constitutional tort.'") (quoting *Monell*, 436 U.S. at 691). In addition, Centurion's "policy or custom" of failing to train and supervise its employees must exist "to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with [Centurion] employees[.]" *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010).[20]

Deliberate indifference further "requir[es] proof that a[n] [] actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). The Second Circuit has "discern[ed] three requirements that must be met before a [] failure to train or supervise constitutes deliberate indifference[,]" including: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult[,] or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (citing *Harris*, 489 U.S. at 390). Additionally, "to survive a motion to dismiss, the complaint must plainly identify the type of training the

---

[20] *See also Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 430-31 (S.D.N.Y. 2012) ("The custom or usage of constitutional violations must be so pervasive that the need for corrective action can fairly be considered 'obvious,' such that the supervising policymaker's failure to take such action gives rise to an inference of her deliberate indifference to inmates' constitutional rights.") (citing *Dilworth v. Goldberg*, 2011 WL 3501869, at *25 (S.D.N.Y. July 28, 2011)); *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 737 (6th Cir. 2015) ("[Plaintiff's] burden under § 1983 is to prove that [defendant corporation's] failure to train and supervise its LPN nurses about the legal duty to provide constitutionally adequate medical care amounted 'to deliberate indifference to the rights of persons with whom the [nurses] come into contact.'") (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)) (third alteration in original). Plaintiff must also allege "a causal link between the policy, custom, or practice and the alleged injury." *Brandon*, 705 F. Supp. 2d at 277.

. . . employees lacked[.]" *Pettiford v. City of Yonkers*, 2021 WL 2556172, at *8 (S.D.N.Y. June 21, 2021).

Plaintiff asserts that Centurion "had a duty to train and supervise [its] subordinates in a responsible manner and breached that duty, knowing that the breach increased the foreseeable risk that prisoners like [Mr.] Johnson would be harmed[,]" (Doc. 27-2 at 19, ¶ 94), and that Centurion's "failure to appropriately train and supervise [its] medical providers to respond to [Mr.] Johnson's symptoms, refer him to a specialist, or otherwise intervene" constituted a breach of the standard of care owed to him, and that this conduct amounted to deliberate indifference to his medical needs. *Id.* at 17, ¶¶ 76-78. The AC also cites the DRM Report's conclusions in asserting that it is "reasonable to conclude that racial bias led correctional and medical staff to disbelieve [Mr.] Johnson" and that "staff needed to receive 'regular and rigorous' training on racial bias." *Id.* at 9, ¶ 25 (quoting Doc. 40-2 at 38). These conclusory allegations will not suffice. Plaintiff does not identify Centurion's policy or custom at issue or explain how it proximately caused Mr. Johnson's suffering or death. Although she claims acts and omissions by various Centurion employees, she does not plausibly allege those individuals were carrying out Centurion's directives. She also does not identify the training or supervision that would alleviate Mr. Johnson's harm. Plaintiff therefore does not allege a plausible § 1983 *Monell* claim against Centurion. *See Bliven v. Hunt*, 478 F. Supp. 2d 332, 339-40 (E.D.N.Y. 2007) (holding that the "simple recitation that there was a failure to train municipal employees does not sufficiently allege a claim that would give rise to municipal liability" and concluding that although the plaintiff's complaint contains allegations against individuals, it lacked "sufficient allegations from which the [c]ourt [could] infer that [the] [d]efendant failed to train and supervise its employees") (internal quotation marks omitted).

For the reasons stated above, Centurion's motion to dismiss Plaintiff's § 1983 failure to train and supervise claim (Count IV) under Fed. R. Civ. P. 12(b)(6) is GRANTED.

**6.    Whether Plaintiff Plausibly Pleads a § 1983 Failure to Train and Supervise Claim Against Officer Wright and Dr. Fisher (Count IV).**

In Count IV, Plaintiff asserts that Officer Wright and Dr. Fisher "had a duty to train and supervise their subordinates in a responsible manner and breached that duty[.]" (Doc. 27-2 at 19, ¶ 94.) In *Iqbal*, the Supreme Court held that in supervisory liability cases, plaintiffs must prove that "each government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. In *Tangreti*, the Second Circuit reiterated that civil rights plaintiffs "may not rely on a special test for supervisory liability" but instead must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d at 616 (quoting *Iqbal*, 556 U.S at 676); *see also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("[T]here's no special rule of liability for supervisors. The test for them is the same as the test for everyone else."). For this reason, prison officials may not be held liable "by reason of [their] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619. Plaintiff must instead assert her claims against Officer Wright and Dr. Fisher directly and must allege that they personally violated Mr. Johnson's constitutional rights "by [their] own conduct, not by reason of [their] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 618-19.

In addition, a "plaintiff cannot press both direct and supervisory claims against a single defendant, with both claims premised on the same conduct." *Martinez v. City of New York*, 564 F. Supp. 3d 88, 105 (E.D.N.Y. 2021) (internal quotation marks omitted); *see also Burch v. City of New York*, 2016 WL 11430773, at *16 (E.D.N.Y. Apr. 22, 2016) ("To the extent [plaintiff's] supervisory liability claim is premised on [the defendant's] personal participation in the alleged constitutional violations, however, it is duplicative of her deliberate indifference and failure to intervene claims. Those claims may proceed[,] but [plaintiff] may not assert a second set of identical claims premised on the same conduct under the label 'supervisory liability.'"). For this reason, the court GRANTS

39

Officer Wright's motion to dismiss Plaintiff's § 1983 failure to train and supervise claim against him (Count IV) as duplicative of her direct constitutional claims against him.

The AC does not allege that Dr. Fisher was personally involved in Mr. Johnson's medical care. Instead, Plaintiff merely alleges that Dr. Fisher was Centurion's medical director and in that role was "ultimately responsible for [Mr.] Johnson's medical care and the care provided at the facility housing [Mr.] Johnson through other Centurion employees." (Doc. 27-2 at 10, ¶ 30.) The AC's remaining allegations pertain to Dr. Fisher's alleged breach of his duty to train and supervise employees. *See id.* at 17, ¶ 77 (alleging that Dr. Fisher's "failure to appropriately train and supervise medical providers to respond to [Mr.] Johnson's symptoms, refer him to a specialist, or otherwise intervene was a breach of the standard of care" owed to Mr. Johnson); *id.* at 19, ¶ 94 (alleging that Dr. Fisher "had a duty to train and supervise [his] subordinates . . . and breached that duty"). Other than in a conclusory manner, the AC neither explains how Dr. Fisher's alleged failure to train and supervise Centurion's employees led to Mr. Johnson's death, nor describes the training and supervision needed. Conclusory allegations such as those set forth in the AC fail to satisfy *Tangreti*'s requirement of personal involvement. Because Plaintiff has not alleged that Dr. Fisher violated Mr. Johnson's constitutional rights "by [his] own conduct," rather than "by reason of [his] supervision of others who committed the violation[,]" *Tangreti*, 983 F.3d at 618-19, Plaintiff's § 1983 claim against Dr. Fisher for failure to train and supervise (Count IV) must be DISMISSED.

## CONCLUSION

For the reasons set forth above, the court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss. (Docs. 17, 40, & 42.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _18th_ day of May, 2023.

Christina Reiss, District Judge
United States District Court

40